FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| PAUL MORRELL, INC.<br>D/B/A THE EVENT SOURCE<br>14901 S. HERITAGEQUEST WAY<br>SUITE B<br>BLUFFDALE, UT 84065<br><br>Plaintiff,<br><br>v.<br><br>KELLOGG BROWN & ROOT<br>SERVICES, INC.<br>1550 WILSON BLVD, SUITE 400<br>ARLINGTON, VA 22209<br><br>SERVE: CT CORPORATION SYSTEM<br>4701 COX ROAD, SUITE 301<br>GLEN ALLEN, VA 23060-6802<br><br>KBRI TX-1 NEWCO, INC.<br>4100 CLINTON DRIVE 04-135<br>HOUSTON, TEXAS 77020<br><br>SERVE: CT CORPORATION SYSTEM<br>1021 MAIN STREET, SUITE 1150<br>HOUSTON, TEXAS 77002<br><br>and<br><br>KELLOGG BROWN & ROOT<br>INTERNATIONAL, INC.<br>601 JEFFERSON STREET<br>HOUSTON, TEXAS<br><br>SERVE: CT CORPORATION SYSTEM<br>350 N. ST. PAUL STREET<br>DALLAS, TEXAS 75201<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )<br><br>Civil Action No. 1:08CV72<br>GBL/BRP |

## COMPLAINT

COMES NOW, Plaintiff Paul Morrell, Inc. doing business as The Event Source ("TES"), by undersigned counsel, and for its Complaint against Kellogg Brown & Root Services, Inc., KBRI TX-1 Newco, Inc., and Kellogg Brown & Root International, Inc. (collectively "Defendant" or "KBR") states as follows:

## PARTIES

1.    TES is a Utah corporation with its principal place of business at 14901 Heritagequest Way, Salt Lake City, Utah 84065.

2.    KBRI TX-1 Newco, Inc., into which Kellogg, Brown & Root, Inc. merged effective in or about December 2005, is a Texas corporation with its principal place of business in Houston, Texas.

3.    Kellogg Brown and Root Services, Inc. is a Delaware corporation with its principal place of business in Arlington, Virginia.  In 2003, Brown & Root Services, a division of Kellogg Brown & Root, Inc., changed its name to Kellogg Brown & Root Services, Inc.

4.    Defendant Kellogg Brown & Root International, Inc. is a Delaware corporation with its principal place of business in Houston, Texas.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) based on diversity jurisdiction; the matter in controversy exceeds $75,000, exclusive of interest and costs.

6.    Venue is proper in this Court in accordance with 28 U.S.C. § 1391.

## FACTS APPLICABLE TO ALL COUNTS

7.    TES is a logistics and event planning coordinator and was so prior to

calendar year 2003.

    8.    On or about June 15, 2003, TES entered into a subcontract with KBR entitled Master Agreement No. LOGCAP-KU-MA0004 ("Contract") whereby TES was to establish and operate certain dining facilities ("DFACs") in Iraq to serve primarily coalition troops stationed at various bases they established after the invasion of that country in March 2003. The Contract awarded was for four consecutive 180-day periods and was to continue as long as the "Prime Contract" (Contract No. DAAA09-020D0007, Logistics Civil Augmentation Program ("LOGCAP III")) between KBR and the U.S. Government was in effect.

    9.    At all times relevant hereto, KBR was the overall logistics contractor for the United States Military in Iraq under the Prime Contract. It was the U.S. Defense Department's plan to feed troops at several bases in Iraq through the use of contractor personnel rather than by full-time troops assigned to that task.

    10.    The Contract between TES and KBR consists of a Master Agreement (Exhibit 1) and the following documents, each of which was incorporated into the Contract by reference: (i) the June 11, 2003 statement as to the scope of work ("SOW") (Exhibit 2); (ii) the subcontract general conditions ("General Conditions") (Exhibit 3); and (iii) the Logcap Purchase Order/Subcontract Special Conditions for Overseas Subcontracts ("Special Conditions") (Exhibit 4) (the Master Agreement, SOW, General Conditions, and Special Conditions hereafter collectively the "Contract" unless otherwise expressly provided). The Contract was drafted solely by KBR and was presented as a "take it or leave it" proposition. Accordingly, TES made no changes to the Contract.

    11.    As contemplated by the Contract, and after the Contract was executed, KBR

instructed TES to propose pricing for various DFAC sites. By letter dated June 26, 2003 and five letters each dated July 11, 2003, TES provided KBR with the requested pricing data for six DFAC sites. Pursuant to the Contract, the proposed pricing was based on a "Per Person/Per Day" rate. The Per Person/Per Day rate that TES proposed, that KBR accepted, and that became a part of the Contract, was calculated as the greater of (a) the actual number of people served per day, plus ten percent (10%) as required by the SOW ("Actual Headcount"), or (b) a minimum "invoicing floor" amount to which the ten percent (10%) would be added to account for the KBR SOW requirement ("Invoicing Floor").

12.    After KBR agreed to the pricing methodology proposed by TES, KBR issued six Work Releases for TES to mobilize, construct and operate the following dining facilities ("DFACS"): the Baghdad International Airport ("BIAP") DFAC, also known as "Bob Hope" and "D-5" (by letter dated  June 28, 2003 and showing an effective date of June 28, 2003); and the five DFACs near the city of Mosul known as H-1 (Mosul Freedom Palace, Iraq Dining Facility; "H-1 site"), H-2 (the Mosul Airfield, Iraq Dining Facility; "H-2 site"), H-3 (the Qayyarah West, Iraq Dining Facility; "H-3 site"), H-4 (the O Glory, Iraq Dining Facility; "H-4 site"), and H-5 (the Tall Afar, Iraq Dining Facility; "H-5 site") (each by letters dated  July 11, 2003 and showing an effective date of  July 15, 2003).  Under the terms of the Contract, TES was required to provide all bonds, labor, material, equipment, transportation, insurance, supervision, permits, supplies, documentation, inspection and related work to provide full DFAC/food services at each of the foregoing DFAC sites.

13.    After the commencement of the meal services at each of the DFAC sites,

4

TES requested direction regarding the invoicing process and KBR directed TES to use the applicable Per Person/Per Day rate based on the most number of people who ate at any meal on any particular day, as determined by a manual head count.

14.   TES performed its contractual obligations at each of the six DFAC sites for more than the initial 180-day period.  Despite a clear agreement on the Per Person/Per Day rate, KBR unilaterally attempted to impose on TES Contract pricing other than the greater of the Actual Headcount or Invoicing Floor.  In order to be paid in a timely manner, TES agreed to invoice KBR on a number of different bases dictated by KBR as long as the parties "trued up" the amount owed to TES periodically under the agreed upon Per Person/Per Day rate, on which TES relied when it entered into the Contract. KBR agreed to the "true up invoice" process, and TES continued to perform at all DFAC sites despite the fact that KBR did not pay all of the TES monthly invoices, and paid every invoice late under applicable Contract requirements.

15.   TES maintained its main offices in Salt Lake City, Utah from before it entered the Contract, throughout performance and still has offices there today.  During the entire time it was performing its Contract obligations, TES carried out a number of Contract-specific functions from, and maintained accounting and other records that it needed at, its offices in Salt Lake City, Utah.

16.   The Contract provides for a change order and an equitable adjustment if KBR directed TES to perform work or furnish services not included in the original SOW.

17.   During the course of TES's performance, KBR directed TES to perform a number of work items that KBR acknowledged were in addition to those required by the Contract.  Among these extra tasks were: the furnishing of housing units; the furnishing

of protective body armor; and the furnishing of additional food supplies, for all of which KBR agreed to pay TES additional amounts. These additional tasks were referred to as "non-food service items".

18.    The Contract provided that TES would perform for a maximum of four 180- day periods. TES commenced contract performance on or about August 14, 2003 and was terminated by KBR at the individual sites effective at different times in February, March and July 2004. The last site terminated was the D-5 (BIAP) site. Other than for the D-5 (BIAP) site, KBR gave TES no reasons for the terminations. Despite the terminations, the Contract remained open since administrative activity thereunder − including but not limited to KBR paying the outstanding invoices owed for the Per Person/Per Day rate and change order work − remained unresolved after TES stopped performing its Contract obligations at the various DFAC sites.

19.    On or about June 22, 2004, TES and KBR entered into Amendment No. 1 to the Contract. (Exhibit 5.)  In Amendment No. 1, KBR, *inter alia*, (i) agreed to pay TES in a timely manner for the non-food service items at agreed-upon prices, (ii) confirmed that it was bound to pay for food services provided based on the Per Person/Per Day rate (as calculated as the greater of Actual Headcount or Invoicing Floor), and (iii) agreed to extend contractual time limits for TES to submit claims under the Contract without identifying or limiting in any way what could be claimed. (Exhibit 5.)

20.    Commencing in June 2004, and after TES's food service performance had been terminated by KBR at each of the H sites, KBR notified TES that the Government had advised KBR that the Government would withhold 19.35% of all of the food service invoices that KBR had submitted for services KBR had performed itself (if any) and/or

that had been performed by its subcontractors on all sites ("Government Holdback").

KBR then withheld payment of all of the invoices that TES was continuing to submit for

the D-5 site and from the yet unpaid invoices until it had withheld 19.35% of the total

amount of invoices submitted by TES. KBR did not give TES any opportunity to object.

21.   Commencing in February 2004 and afterwards as it completed all of its food

service operations, TES submitted final food service "true up" invoices totaling

$36,464,644.65 as the amount to which it was entitled for food service at all DFAC sites

up through the point in time of its termination by KBR. TES had also resubmitted its

invoices for non-food service items prior to April 2005 and reserved the right to submit

other claims as of that time.

22.   In 2004, the Defense Contract Audit Agency ("DCAA") audited the KBR

food service contracts, including the TES Contract, and issued its Report No. 3311-

2004K17900075 on September 14, 2004, which was furnished to the Defense Contract

Management Agency ("DCMA") Contracting Officer. Among other things, DCAA

found that KBR had made a number of errors in its subcontracting process, that it had

failed to follow Federal Acquisition Regulation ("FAR") requirements and that it had

failed to support the reasonableness of the amounts of its subcontract payments and/or

remaining obligations. DCAA recommended that the Contracting Officer withhold

payments from KBR, which withholding included payments that KBR owed TES.

DCAA did not direct, either in its Report or orally to KBR, that KBR withhold any

particular amounts from TES at any of the DFAC sites.

23.   In March 2005, KBR and the DCMA Contracting Officer entered into a

settlement agreement under which KBR agreed to a final Prime Contract holdback of $55

Million. As part of its settlement, KBR agreed to be bound thereby for itself and its subcontractors, and it waived all rights to appeal under available disputes resolution procedures. This was a business decision taken unilaterally by KBR and without notice to or the agreement of TES.

24.   In April 2005, TES and KBR negotiated a settlement of TES's outstanding food service invoices. During negotiations, authorized KBR representatives affirmatively represented to TES, both in writing and orally, that the final amounts KBR could pay to TES on each of the six DFAC sites had been determined by the Government and that KBR had no ability to increase or decrease the amount that would not be paid to TES ("KBR Holdback"). Based on these express representations, TES agreed to a KBR Holdback of $12,424,387.71 from its invoices.

25.   On April 29, 2005, TES and KBR entered into Amendment No. 2 to the Contract reflecting, *inter alia*, the "settled" reduction of food service payments and preserving TES's right to submit additional claims. (Exhibit 6.) The non-food service invoices were also open and unresolved.

26.   TES complied with all contractual requirements with regard to its entitlement to equitable adjustments to the Contract price and still has not been paid for additional work and items delivered pursuant to KBR directives. TES submitted written claims to KBR for its consideration and responded to all KBR requests for documents supporting TES invoices and claims, often multiple times.

27.   KBR has wrongfully refused to pay TES for additional work it directed TES to perform beyond the scope of the Contract and for interest accrued as a result of KBR's late payment of TES invoices, which interest is allowable under the Contract and

8

applicable law.

28.   TES submitted certain claims to KBR, with the last submission being delivered on April 5, 2007. Most of the latest submission was a restatement of the many open items that have been unresolved by the parties since April 2005. These claims are timely both under the terms of the Contract and by express agreement of the parties in Amendments 1 and 2 of the Contract.

29.   TES has complied with all conditions precedent to bringing this suit for recovery on its claims. TES sought to resolve its claims with KBR and was spurned by an authorized KBR representative, who refused orally and in writing to negotiate or engage in alternative dispute resolution procedures, as provided under the Contract. KBR has not initiated any further communications with TES representatives for over six months since KBR rejected TES' offer to try to resolve its claims.

**COUNT 1**
**BREACH OF CONTRACT/INTENTIONAL**
**INTERFERENCE WITH ECONOMIC RELATIONS:**
**WRONGFUL TERMINATION AT THE H SITES**

30.   The foregoing paragraphs 1 – 29 are incorporated by reference as if fully set forth herein.

31.   Under the Contract, TES was required to provide DFAC services to each of the five "H sites" for an initial 180-day period, with three 180-day option periods. The Contract provided that TES would perform for a total of 2 years, in four 180-day increments, unless (i) the Government no longer "required" DFAC services at a particular location, or (ii) KBR's Prime Contract with the Government was terminated. The performance period was divided in this manner because KBR did not know how long the conflict would last, how long TES's services would be needed in particular locations, or

9

how long KBR's own services would be required by the Government.

32.   The Contract established how and when TES could change its pricing during the 2-year performance period, stating "[i]n no event will the prices under this [Contract] exceed those proposed during the solicitation. [TES] can change offered prices once after the completion of the initial 180-day period after date of award, and on a 180-day period OPTION PERIOD basis, if required, thereafter." After execution of the Contract, KBR sent TES a Request for Plan of Execution of Project ("RFPEP") for each of the DFAC sites. Attached to the RFPEP was a pricing table that KBR asked TES to complete and which TES completed and returned to KBR.

33.   TES expended considerable resources to prepare and mobilize to provide services at each of the DFAC sites and assumed considerable risk to find, negotiate with, train and supervise its subcontractors, all based on KBR's representations in the initial Request for Proposal, SOW, Contract and RFPEP that TES's performance at each site would be for a period of two (2) years.

34.   The Contract permitted TES to employ subcontractors, rather than hire employees, to perform the work. TES hired Akfen Construction Touring and Trading Inc. ("Akfen") for the H1 and H-4 sites, ABC International Group, W.W.L. ("ABC"), for the H-2 site, and Alargan Trading Est. ("Alargan"), for the H-3 and H-5 sites. TES provided on-site management personnel and systems at each site to assure that Contract performance requirements were met.

35.   TES had written non-competition agreements with ABC and Akfen and an oral non-competition agreement with Alargan. The written agreements also included obligations of complete good faith and fair dealing for both contracting parties. TES

informed KBR of these non-competition agreements, provisions and obligations.

36. TES performed at the H-1 site from August 28, 2003 through March 11, 2004. On January 27, 2004, KBR informed TES that KBR unilaterally had decided to re-bid the H-1 site and that Request for Proposal ("RFP") submissions were due by February 4, 2004, later extended to February 24, 2004. Despite its understanding that it had contracted for all four periods of 180 days each, TES timely submitted its RRP response.

37. TES performed at the H-2 site from August 25, 2003 through March 25, 2004. On January 27, 2004, KBR informed TES that KBR unilaterally had decided to re-bid the H-2 site and that RFP responses were due by February 4, 2004, later extended to February 29, 2004. Despite its understanding that it had contracted for all four periods of 180 days each, TES timely submitted its RFP response.

38. TES performed at the H-3 site from August 14, 2003 through February 14, 2004. On January 26, 2004, KBR informed TES that KBR unilaterally had decided to re-bid the H-3 site and that RFP responses were due by February 2, 2004. Again, TES timely submitted its RFP response despite its understanding that it had contracted for all four periods of 180 days each.

39. TES performed at the H-4 site from August 21, 2003 through March 7, 2004. On January 27, 2004, KBR informed TES that KBR unilaterally had decided to re-bid the H-4 site and that RFP responses were due by February 4, 2004, later extended to February 29, 2004. Again, TES timely submitted its RFP response despite its under-standing that it had contracted for all four periods of 180 days each.

40. TES performed at the H-5 site from August 22, 2003 through March 8, 2004. On January 27, 2004, KBR informed TES that KBR unilaterally had decided to re-

bid the H-5 site and that RFP responses were due by February 4, 2004, later extended to February 29, 2004. Again, TES timely submitted its RFP response despite its understanding that it had contracted for all four periods of 180 days each.

41.  Even though KBR's original RFP, the SOW, the Contract, the RFPEP and TES's responses thereto provided for performance of four 180-day periods, KBR unilaterally decided near the end of the initial 180-day period to re-bid TES's contracts at each of the H-sites.

42.  The tight time frame and surprise nature of KBR's action deprived TES of the opportunity to protest KBR's action. TES submitted RFP responses for all H-sites to preserve its position as a subcontractor and its standing to complain about KBR's tactic to force TES to lower its prices. Further, all of TES's responses to KBR's 2004 RFPs were premised on the continuation of TES's existing subcontractors, each of which was contractually required to provide services to TES for the full two-year period of performance.

43.  After submission of proposals and the close of bidding, KBR directly approached each of TES's H-site subcontractors and asked that they submit independent bids for their particular DFAC site(s), which – upon information and belief – violated KBR's own RFP standards by both re-opening the bidding process to less than all of the bidders and directly soliciting bids from another bidder's subcontractors with whom such bidder had already collaborated on its own initial bidding strategy. Upon information and belief, KBR approached TES's subcontractors even though it knew that (i) TES based its 2004 RFP responses on services to be provided by TES's existing subcontractors, whose personnel TES had already trained and managed for the initial 180-day period and (ii) the

TES subcontractors had entered into non-competition agreements and obligations of good faith and fair dealing with TES.

44. In February 2004, ABC's owner told TES's President that ABC preferred not to bid against TES because he believed that it was unethical and a breach of the non-competition agreement, but that KBR had told ABC if it did not submit a bid, it – as well as TES – would be terminated. As a result, ABC submitted a bid for the H-2 site.

45. As part of the 2004 RFP process, KBR provided a new scope of work ("2004 SOW") for each H-site. Each 2004 SOW listed the initial period of performance as lasting 365 days and contained the following language, which differed significantly from the Contract: "[t]he [period of performance] may be extended at the discretion of [KBR] in increments determined by [KBR] pending availability of funds and desires of the US Government."

46. The 2004 SOWs and the following facts demonstrate that KBR had decided, prior to receiving any responses to the 2004 RFPs, that it would replace TES at each of the H-sites:

      a. Section 2.2 of the 2004 SOWs required bidders to "develop and execute a plan which results in [a] smooth transition from [TES]".

      b. Section 2.2.1 of the 2004 SOWs provided that the transition from TES to a different bidder could be accomplished by any methodology, including "the incorporation of [TES's] existing work staff and equipment" into its bid.

      c. Section 2.2.2 of the 2004 SOWs prohibited bidders from subcontracting to TES.

      d. Section 5.1 of the 2004 SOWs required bidders to use TES's existing dining facility structure, rather than provide their own, and also explicitly precluded TES from being involved with the DFAC operation going forward.

47.   KBR drafted each 2004 SOW in a manner that allowed other bidders to submit bids using TES's dining facility structure, equipment and staff.

48.   By encouraging and pressuring TES's subcontractors to bid against TES and refusing to allow the subcontractors to subcontract with TES for management or other services, KBR actively interfered with TES's prospective economic advantage and gave the subcontractors a significant competitive advantage over TES.

49.   On March 6, 2004, KBR informed TES that it had awarded the H-5 contract to Alargan. KBR subsequently awarded each of the H-sites to TES's subcontractors (or their affiliates), with the result that the same people who were working for TES on the day prior to the TES termination were using the same equipment, structures, facilities and management, which were created by TES, the day after TES's termination.

50.   TES worked the entire initial 180-day period and into the second 180-day option period at four of the five H-sites before KBR terminated its services.

51.   With the exception of one contractor that was accused of bribing KBR officials, KBR did not re-bid any other subcontractors' DFAC service agreements. TES has never been accused of or implicated in bribing KBR officials.

52.   KBR breached the Contract by wrongfully terminating TES at each of the five H-sites prior to the expiration of the contractually agreed upon 2-year performance period. Upon information and belief, the entities that replaced TES at each H-site continued to work for KBR for the remainder of the original 2-year period of performance.

53.   KBR tortiously interfered with TES relationships with each of its subcontractors at the H-sites by inducing them to breach their subcontracts with TES for KBR's

14

own immediate gain.  Had KBR not done this, it would not have been able to service the affected DFAC sites without finding its own subcontractors, incurring expenses to procure or replace the facility and equipment and losing time in effecting the transition.

54.   KBR intentionally interfered with TES's potential economic relations by wrongfully terminating TES at each of the 5 H-sites prior to the expiration of the contractually agreed-upon 2 year period of performance.

55.   KBR intentionally interfered with TES's potential economic relations by inducing TES's subcontractors to breach their contracts with TES for KBR's own immediate gain.

56.   KBR had no legitimate economic motivation to justify its intentional interference with TES's potential economic relations.  Even if KBR had any economic motivation for its interference, KBR's desire to injure TES predominated over any such economic motivation.

57.   TES has been damaged by KBR's breaches of contract and is liable to TES in the amount of $36,947,238.00, plus applicable interest, therefor.

58.   KBR's intentional actions to interfere with TES's contractual relations with its subcontractors entitle TES to recover punitive damages against KBR in an amount to be determined at trial.

**COUNT 2**
**FRAUDULENT MISREPRESENTATION;**
**BREACH OF FIDUCIARY DUTY: REFORMATION OF AMENDMENT 2**

59.   Paragraphs 1 – 29 are incorporated by reference as if fully set forth herein.

60.   KBR and TES agreed to a food service pricing and payment arrangement in the midst of a dynamic Iraq war situation that had begun only two months earlier.  TES

assumed the complete risk of establishing a full food service facility to serve a Government-estimated minimum number of troops at each site to fulfill one of KBR's tasks included under its Prime Contract with the DCMA. TES had to set its pricing to account for all unknown conditions and contingencies, none of which could be identified by KBR or the U.S. Government representatives in the area. TES expressly advised KBR that its pricing was based and dependent on a minimum number of people using each facility each day (*i.e., the* Invoicing Floor). TES's pricing submission included an "Assumptions and Risk Mitigation" document that explicitly provided that the pricing would be the greater of Invoicing Floor or Actual Headcount.

61.     Upon KBR's acceptance of the pricing proposals (by issuing TES the required Work Releases), the TES pricing proposal became a part of the Contract and TES commenced work accordingly.

62.     There were no published or even informal Government regulations or guidelines for KBR contracting personnel to follow concerning how to count the number of meals "served" for billing purposes. KBR neither provided nor referenced any guidelines for TES's use either in preparing its initial pricing or "counting troops" for purposes of invoicing. KBR was directed by the Army to have four daily meals prepared, with each in an amount sufficient to feed all the troops identified in the troop number identification information that the Army provided initially, plus ten percent (10%). KBR was directed to have every type of food available regardless of when a particular soldier came through the food line, including the last soldier of what were often thousands. KBR directed TES to comply with these Army requirements and prepare food for the following day based on the largest number of troops who ate any one meal during the previous day.

16

TES followed KBR's directives, constructed appropriate-sized DFACs, procured the required equipment, obtained and prepared food and staffed meals accordingly.

63. TES prepared and maintained backup support for its invoices for each meal served during the contractual one-month billing cycles and prepared and supported its invoices according to the agreed upon Per Person/Per Day rate. KBR agreed that TES was invoicing and documenting its invoices in a manner acceptable to KBR. Nonetheless, from time to time during the period of TES's performance, KBR directed TES to use different invoicing methodologies. TES did its best to accommodate KBR in order to get paid in a timely manner and actually used three (3) different billing methods, while reserving its right to submit – as agreed by KBR – "true up" invoices at the end of the Contract period that would reflect the full Per Person/Per Day rate. These "true-up" invoices made adjustments for the difference between the particular billing methodologies KBR imposed, usually without explanation, and the agreed-upon Contract method. KBR agreed to the true-up approach on several occasions, including in Amendment 1 to the Contract.

64. In June 2004, the Government began withholding payments to KBR ("Government Holdback") pending an investigation of certain DFAC billing issues. Allegedly pursuant to the Government's investigation of the DFAC costs, KBR stopped paying TES's then-current invoices at the D-5 site where TES was still performing and also refused to pay previously submitted but unpaid food service invoices until the withheld amount constituted 19.35% of the total amount previously paid to TES at all of the DFAC sites.

65. At the time KBR began withholding the Government Holdback, TES had

paid its subcontractors at the H-sites almost 100% of their invoices. Because TES was no longer working with its subcontractors at any of the H-sites, TES was unable to recoup the funds it had paid to its subcontractors to account for the Government Holdback.

66.    The Government's rationale for the Government Holdback was based on: (i) DCAA audits and invoice methodology and support reviews of KBR's actions, which were completed and reported in DCAA's September 14, 2004 Audit Report; and (ii) further discussions between KBR and DCMA representatives during the June 2004 – March 2005 period. The Government disagreed with KBR's subcontracting bases and accused KBR of failing adequately to support its subcontract payments. The Government noted other purported KBR shortcomings and insisted that KBR agree to a "decrement," or prime contract payment downward adjustment, for the DFAC services even though those services had already been furnished. The Government furnished KBR with drafts of the DCAA audit report and allowed KBR to (i) disagree with it in writing and (ii) have its comments included in the final DCAA published Audit Report. The KBR comments and further discussions resulted in the Government reducing the 19.35% Government Holdback at every H site to amounts agreed upon by the Government and KBR. TES was unaware of and not a participant in this later adjustment process.

67.    KBR had the option to dispute even the final Government Contracting Officer's findings and determinations about amounts to be withheld for the TES H-sites under dispute resolution procedures set forth in the Prime Contract; KBR could have challenged all or any element of the Government's position, and it also could have allowed TES to sue in KBR's name if TES did not agree with the Government's position. These options were also permitted under the Contract.

68.  Without TES's knowledge, KBR settled all of the DFAC issues and payment matters that the Government had raised as of April 2005 and to waive its right and the rights of its subcontractors, including TES, to pursue recovery of additional portions of the withheld funds, despite the fact that the Government decision was not a final decision with which KBR was forced to comply. The final holdback amounts were all below the initial 19.35% Government Holdback and were the result of discussions and negotiations between KBR and the Government of which TES was unaware and to which TES was not a party. The amounts of the reductions for each TES site identified by the Government were binding on KBR after the settlement as reductions of KBR total invoices, not TES invoices. The Government did not prevent KBR from settling separately with TES on any terms that KBR was able to negotiate or for any amount that KBR was willing to pay TES; nothing the Government wrote or said to any KBR representative participating in discussions and/or negotiations on a final DFACS settlement constituted a Government directive that KBR not pay TES more than the Government was willing to pay KBR against the invoices KBR submitted for food service for the period that service was provided by TES.

69.  On April 15, 2005, KBR expressly represented to TES that the Government had come to a decision on the Government Holdback issue. TES and KBR representatives met to discuss that decision and payment of TES's invoices. During the meeting, KBR gave its letter to TES that stated, in part, that the Government had decided to refund most (but not all) of the Government Holdback and that KBR would pay monies withheld from TES as KBR received funds from the Government. KBR further represented that: (i) the Government had not consulted KBR regarding how it calculated

the amount that KBR would not pay TES ("KBR Holdback") at each DFAC site; (ii) KBR did not know precisely how the Government calculated the KBR Holdbacks; (iii) the Government had presented the KBR Holdback amounts to KBR on a "take it or leave it" basis; and (iv) if TES wanted to recover any of the Government Holdback, it had to accept the KBR Holdback dictated by the Government. KBR also told TES that KBR was unable to pay more money to TES than the Government was to pay KBR.

70.    Amendment 2 to the Contract states, in pertinent part, with respect to each DFAC, "KBR *represents and warrants* that the 'KBR Holdback' ... *was calculated by the Government* based on a number of factors, primarily including actual headcount and the period of performance, and that *KBR has no ability to increase or decrease the KBR Holdback*." (Exhibit 6, §3; emphasis added.)

71.    On April 30, 2005, KBR sent six letters to TES (one letter for each of TES's DFAC sites) addressing the Government Holdback and the "Government's review." Each letter said "the Government has instructed us to pay [____] % of the total amount invoiced by TES (in other words, the government has decreased the total amount invoiced by TES by [____] %)" with the percentage included for each individual site.

72.    TES told KBR that TES would not accept the KBR Holdback in its invoices unless it was ordered by the Government to do so. KBR made express written and verbal representations that it was following Government instructions with the specific intent to induce TES to accept the KBR Holdback and reductions to its invoices and execute Amendment 2.

73.    TES relied on KBR's representations and executed Amendment 2, which TES would not have done absent the KBR representations. Pursuant to the terms of

Amendment 2, KBR paid TES $24,040,256.94, calculated by taking the total amount billed to KBR by TES for DFAC services at all sites, less amounts paid to TES and the reduced KBR Holdback. The total amount of the KBR Holdback is $12,424,387.71.

74.   As noted in the DCAA report, to the extent the Government withheld funds from KBR that were related to the TES DFAC sites, that withholding was based on, among other reasons set forth in the DCAA report: (i) KBR's lack of communication with the Government regarding TES's DFAC invoices; (ii) KBR's failure to properly document the terms of its Contract with TES; and (iii) KBR's failure to supply sufficient documentation to the Government (which TES had previously supplied to KBR) in support of TES's invoices.

75.   KBR's failure to provide sufficient documentation to support the invoices it submitted to the Government was a breach both of its obligations under its Contract with TES and its fiduciary duties to TES to assure that its subcontractors were promptly and properly paid under a federal government contract.

76.   KBR's representation that the Government had imposed specific percentage reductions on the TES DFAC invoices that KBR was helpless to remedy on any of the H sites was a fraudulent misrepresentation that injured TES.

77.   TES is entitled to payment from KBR of the full amount of the fraudulently withheld KBR Holdback in the amount of $12,424,387.71, plus interest thereon until paid, as compensatory damages for KBR's fraud against it.

78.   TES is entitled to be paid by KBR for at least $37,275,000 in punitive damages because of KBR's having committed a fraud against TES.

79.   TES is entitled to have Amendment 2 to the Contract reformed to provide

for payment to TES of the full unpaid amount of its invoices for food services at its DFAC sites.

## COUNT 3
## INTEREST ON DINING FACILITY INVOICES

80.  Paragraphs 1- 29 are incorporated by reference as if fully set forth herein.

81.  TES timely submitted monthly invoices for work performed at each of the DFAC sites during the prior invoicing period.

82.  The Contract required KBR to pay the TES invoices within thirty days after approval by KBR, KBR's acceptance of the work, receipt from TES of all required documentation and reports, and payment to and receipt by KBR from the Government. Each of the Work Release letters sent by KBR to TES for the DFAC sites also provides for payment by KBR to TES "[n]et 30 days after receipt of all documentation . . . ."

83.  The TES submittals gave KBR adequate time to process the invoices and pay them within thirty calendar days.

84.  KBR never notified TES that payment for any particular TES DFAC invoice was being delayed because: (i) KBR did not approve the invoice; (ii) the invoice did not include all required documentation and reports; (iii) KBR did not accept the work; or (iv) KBR had not received payment from the Government.

85.  TES attached all required documentation to its invoices to KBR and complied with the Contract requirements and followed KBR's instructions on invoicing. Therefore, if the Government failed to pay KBR in a timely manner because of insufficient documentation, the fault was KBR's, not TES's.

86.  KBR's failure to pay each TES DFAC Invoice within thirty days was a breach of the Contract by which TES was damaged.

87.   KBR's breach of the Contract entitles TES to recover damages in the form of interest pursuant to applicable State law. Utah law provides "[u]nless parties to a lawful contract specify a different rate of interest, the legal rate of interest for the loan or forbearance of any money, goods, or chose in action shall be 10% per annum." Utah Code § 15-1-1(2).

88.   KBR is liable to TES for interest in amounts to be calculated at trial, but not less than $7,759,473, as set forth in the written claim TES submitted to KBR in April 2007, plus such additional interest as accrues until the past-due invoices have been fully paid.

### COUNT 4
### BREACH OF CONTRACT: REFUSAL TO PAY
### FOR HOUSING UNITS SUPPLIED

89.   Paragraphs 1 – 29 are incorporated by reference as if fully set forth herein.

90.   In August 2003, KBR requested a written quotation from TES to supply seventeen housing units ("Housing Units") for use by KBR employees. TES submitted the quotation and, at KBR's express direction, purchased and delivered the Housing Units to KBR in September 2003, obtaining signed receipts from KBR upon delivery.

91.   KBR used the Housing Units as it intended but did not pay TES for them as it was obligated to do.

92.   In September 2003, TES invoiced KBR for the seventeen Housing Units at the agreed price in the currency of Kuwaiti Dinars, namely KWD 69,670 (approx. $253,599 based on an exchange rate of $3.652 per Kuwaiti Dinar that TES has used in this Complaint).

93.   Between November 2003 and February 2007, TES worked with eighteen

different KBR "point people" in its efforts to obtain payment for the Housing Units, which efforts included numerous written demands.

94.   On June 22, 2004, 280 days after the Housing Units invoices were first submitted, TES and KBR executed Amendment 1, which included an explicit commitment by KBR to pay TES for the Housing Units within fifteen days. Notwithstanding this additional contractual commitment, KBR has failed and refused to pay for the Housing Units.

95.   On February 1, 2007, after repeated communications with KBR and compliance with numerous KBR requests that TES modify its invoices, and after KBR's repeated requests for documentation TES had previously provided several times, KBR paid TES KWD 61,000 ($222,040), leaving a balance due of KWD 8,670 ($31,559), exclusive of interest. KBR has failed and refused to pay the balance due to this date despite repeated written demands from TES.

96.   KBR's failure to pay TES for the seventeen Housing Units that TES supplied to KBR in response to its directive is a breach of contract. TES is entitled to recover KWD 8,670 ($31,559), plus interest on KWD 69,670 (approx. $253,599) beginning on the date thirty days after TES first invoiced for the Housing Units, plus interest on the KWD 8,670 ($31,559) beginning February 2, 2007, until paid. As of December 31, 2007, the interest owed for the seventeen Housing Units is KWD 24,103 ($87,734).

97.   KBR directed TES to supply two additional Housing Units ("Additional Housing Units") for use by KBR's employees. In or about July 2004, TES delivered the Additional Housing Units to KBR and submitted an invoice for $29,800 therefor on

24

September 7, 2004. KBR has failed and refused to pay the $29,800 for the Additional Housing Units, despite TES's repeated written demands.

98.   KBR's failure to pay TES for the Additional Housing Units is a breach of contract by which TES has been damaged. TES is entitled to recover $29,800 plus interest from September 7, 2004 until paid. As of December 31, 2007, the interest owed for the Additional Housing Units is $10,016.

**COUNT 5**
**BREACH OF CONTRACT:**
**FAILURE TO PAY FOR BODY ARMOR**

99.   Paragraphs 1- 29 are incorporated by reference as if fully set forth herein.

100.   KBR sent to TES a "Supplementary Agreement" dated August 19, 2003 that required for the first time, among other things, that TES employees wear certain body armor ("Body Armor") when traveling in convoys and when working in certain locations. KBR required TES to execute the Supplementary Agreement and warned that TES's failure to do so could be grounds for Contract termination.

101.   In November 2003, TES purchased the Body Armor, distributed it to its employees as required and submitted six (6) invoices to KBR (one invoice for each DFAC location) in the total amount of KWD 24,647 (approx. $89,715).

102.   On June 22, 2004, TES and KBR executed Amendment 1, which included an additional and explicit contractual commitment by KBR to pay for the Body Armor within fifteen days. Notwithstanding its commitment to do so, KBR has failed and refused to pay for the Body Armor despite TES's repeated written and verbal demands.

103.   KBR's failure to pay for the Body Armor is a breach of contract by which TES has been damages. TES is entitled to recover KWD 24,647 ($89,715) plus interest

from December 1, 2003 until paid.  As of December 31, 2007, the interest owed is KWD 9,386 ($34,166).

**COUNT 6**
**BREACH OF CONTRACT: FAILURE TO PAY**
**FOR CLOSING FOOD INVENTORY AT THE D-5 SITE**

104.    Paragraphs 1- 29 are incorporated by reference as if fully set forth herein.

105.    In May 2004, in response to KBR's purchase of TES's ending food inventory at the D-5 site, TES submitted invoices to KBR for $2,914,848.75 and $296,509.  KBR paid the first invoice on August 1, 2004 (74 days after due) and the second invoice on April 26, 2005 (208 days after due).

106.    On June 22, 2004, TES and KBR executed Amendment 1, which included an explicit commitment by KBR to pay for the ending inventory within fifteen days.  Notwithstanding this additional contractual commitment, KBR failed to pay for the ending inventory in a timely manner.

107.    KBR's failure to timely pay for the ending food inventory at the D-5 site is a breach of contract by which TES has been damaged.

108.    TES is entitled to recover interest accrued as a result of KBR's late payment in the amount of $59,916 plus $19,379 in late payment interest as of December 31, 2007, with interest continuing to accrue until paid.

**COUNT 7**
**BREACH OF CONTRACT:**
**UNDERPAYMENT AT THE H-2 DFAC SITE**

109.    Paragraphs 1- 29 are incorporated by reference as if fully set forth herein.

110.    KBR instructed TES to provide DFAC services at the H-2 site until February 25, 2004 (at which time TES would be terminated).

26

111.   KBR attempted to rebid the DFAC services for the H-sites and to have that work begin before February 14, 2004. Because it was unsuccessful, on February 13, 2004, KBR issued Master Agreement Work Release Change Order No. 1 that extended TES's performance at the H-2 site through February 25, 2004.

112.   On February 21, 2004, KBR instructed TES to disregard the earlier termination notice and to continue providing services at the H-2 site until otherwise notified in writing. TES complied with KBR's written direction and continued to provide services at the H-2 DFAC until March 25, 2004, when it first received any notice (written or verbal) to discontinue those services. TES complied with KBR's order and ceased all operations at the H-2 site on March 25, 2004.

113.   On March 31, 2004, TES submitted its invoice for KWD 813,380.730 (approx. $2,960,706) for the period March 11 through March 25, 2004. Payment was due in thirty days.

114.   On December 2, 2006, TES and KBR executed Change Order No. 4 for the H-2 site which, *inter alia,* confirmed that TES's performance at H-2 ended on March 25, 2004.

115.   KBR has failed and refused to pay TES for the period March 11 through March 25, 2004 despite repeated written and verbal demands by TES. KBR's failure to pay is a breach of Contract by which TES has been damaged.

116.   KBR is liable to TES for KWD 1,111,846 ($2,960,706), plus $1,086,415 in interest through December 31, 2007, with interest continuing to accrue until paid, for its failure to pay for the additional performance ordered by KBR at the H-2 site.

## COUNT 8
## BREACH OF CONTRACT: FAILURE TO PAY TES'S
## DEMOBILIZATION COSTS AT THE D-5 DFAC SITE

117.    Paragraphs 1-29 are incorporated by reference as if fully set forth herein.

118.    The period of performance for the D-5 site, as extended by Change Order No. 6, was scheduled to expire on September 15, 2004.

119.    On July 1, 2004, KBR terminated the Contract "for convenience" effective July 15, 2004.

120.    TES demobilized at the D-5 site after KBR issued its termination directive.

121.    The General Conditions provide that in the event of a termination for convenience, TES is entitled to recover its reasonable costs of demobilization.

122.    On October 10, 2004, TES submitted an invoice to KBR for its reasonable demobilization costs in the amount of KWD 42,243 (approx. $153,765), which was due within thirty days.

123.    KBR has failed to pay the D-5 demobilization invoice, despite repeated written and verbal demands by TES.

124.    KBR's failure to pay for the demobilization of the D-5 site is a breach of the Contract by which TES has been damaged.

125.    KBR is liable to TES for KWD 55,702 ($153,765), plus $48,990 in interest through December 31, 2007, with interesting continuing to until paid for KBR's breach of the Contract.

## COUNT 9
## EXPERT AND CONSULTING FEES

126.    Paragraphs 1 – 29 are incorporated by reference as if fully set forth herein.

127.    TES is a small management type company that prides itself on its ability to take on major projects and utilize a small, tight knit staff of experienced personnel to manage specially hired employees and subcontractors for identified tasks. TES performed its obligations under its Contract with KBR in the same way.

128.    KBR created significant problems for TES by continually refusing to follow the explicit language of the Contract, as well as other written and oral agreements with TES, to resolve administrative matters arising during and after TES's performance that had to be resolved. KBR mandated that TES follow a detailed claim and disputes resolution procedure and set out the procedure in the Contract, which KBR then failed to follow, just as it failed to adhere to the time periods that it also mandated as part of the procedure.

129.    On May 3, 2004, TES hired a General Counsel for the primary purpose of dealing with KBR's multiple contract breaches and collecting funds owed by KBR pursuant to the Contract.

130.    On June 24, 2005, TES sent KBR a letter outlining seven claims against KBR ("June 2005 Demand Letter"). Pursuant to the General Conditions, KBR was required to provide a substantive response within thirty days.

131.    On July 20, 2005, TES followed up on the June 2005 Demand Letter with an email to KBR which, among other things, requested the name and contact information of the next level of the KBR management team that handled claim appeals.

132.    On July 26, 2005, KBR informed TES that its claims had been forwarded to the next level of management that handled claim appeals – *i.e.*, KBR's Arlington, Virginia office.

133.    Between July 26, 2005 and March 2006, TES made numerous attempts to get a substantive response to its June 2005 Demand Letter.  Not only did KBR fail to provide a substantive response, it also failed, on many occasions, even to respond to TES's multiple follow-up emails.

134.    Because of KBR's repeated failures to respond to TES's efforts to resolve the outstanding issues between the parties, in March 2006 TES retained outside counsel for the sole purpose of assisting in the claims resolution process that was drafted by KBR and included in the Contract.

135.    Between March 2006 and March 2007, TES continued to request a substantive response to the June 2005 Demand Letter, as well as documents to assist TES in a related litigation with a subcontractor that sued TES because of actions TES took at the direction of KBR.  KBR continued to refuse to provide a substantive response to  the June 2005 Demand Letter or  any of the documentation requested to support its defense in the litigation with its subcontractor.

136.    Despite frequent submission and resubmission of documents relevant to the claims in the June 2005 Demand Letter, KBR would not tell TES where its claims were in the KBR review process specified in the Contract.  TES ultimately agreed to provide KBR with a "Briefing Book" setting forth its claims in further detail and furnishing all types of detailed documentary support.

137.    After submission of the June 2005 Demand Letter, TES became aware of additional facts about KBR's actions and their impact on TES's performance and payments.  TES utilized its General Counsel and outside counsel to respond to KBR's invitation to resubmit a complete claim package with documents and legal support and

added the new claims to those it had submitted earlier and was resubmitting. TES submitted this additional information and documentation as part of its Briefing Book on April 5, 2007.

138.    By letter dated June 14, 2007, KBR responded to the Briefing Book with a two (2) page letter denying all of TES's claims and stating that the two sides were so far apart there was no sense in trying to negotiate. KBR made no attempt to communicate with TES regarding the TES claims or any other matter after KBR's June 14, 2007 blanket rejection of the TES claims.

139.    KBR elected unilaterally to ignore its own claim resolution procedure that was set forth in the Contract that KBR drafted and required TES to sign, once again forcing TES to expend time and resources complying with the Contract terms with which KBR had no intention of complying before KBR would even consider attempting a resolution.

140.    KBR's failure to comply with its own mandated claims/dispute procedure is a breach of contract by which TES has been damaged; TES incurred costs to comply with the Contractually-required procedure with which KBR failed to comply.

141.    TES is entitled to recover all costs of in-house and outside personnel and all expenses incurred by TES in its compliance with the Contract's specified and detailed claim procedure. TES is entitled to recover for the expenses of these personnel in an amount to be proved at trial but not less than $250,000.

## COUNT 10
## DEFAMATION

142.    Paragraphs 1 – 29 are incorporated by reference as if fully set forth herein.

143. In late 2003 and early 2004, KBR approached TES's subcontractors working on the five H sites near the City of Mosul and made false statements about TES; specifically, KBR accused TES of doing bad work by failing to follow KBR and Government food directives.

144. KBR knew these statements were false when it made them and it made the statements with the intent to damage and destroy the name and reputation of TES.

145. KBR's false statements damaged and destroyed TES's name and reputation with its peers.

146. KBR's actions were malicious, willful, wanton, reckless and done with the sole purpose of damaging and destroying the name and reputation of TES.

147. KBR's conduct entitles TES to punitive damages in an amount not less than $2 Million, to be determined at trial.

## COUNT 11
## BAD FAITH AND UNFAIRNESS WITH INTENT TO HARM

148. Paragraphs 1 – 29 are incorporated by reference as if fully set forth herein.

149. KBR began a pattern of failing to pay TES in a timely manner and, in many cases, it intentionally failed to pay TES at all.

150. KBR wrongly terminated its Contract with TES.

151. KBR tortiously interfered with TES's relationships with its subcontractors.

152. In the 2004 RFP re-bidding process, TES's subcontractors were forbidden by KBR from subcontracting with TES for management or any other services.

153. All of the above actions by KBR establish a predatory intent to injure TES's business, to deprive TES of its reputation, to abuse TES and to eliminate a

potential competitor. These actions were a direct breach of KBR's obligations of good faith and fair dealing with TES.

154.    All of the above actions by KBR, both individually and as a pattern, were malicious, willful, wanton, reckless and done with the sole purpose of damaging and destroying TES's good name and reputation and its ability to do business in the Iraq War theater, with the result that TES was forced out of the dining facility business in Iraq.

155.    KBR's actions entitle TES to punitive damages in an amount not less than $25 million, to be determined at trial.

WHEREFORE, Plaintiff Paul Morrell, Inc. d/b/a The Event Source prays that the Court grant it recovery on its Complaint as follows:

Count 1: $36,947,238 in compensatory damages, plus punitive damages of at least $25 Million, to be determined at trial;

Count 2: $12,424,387.71 in compensatory damages, plus punitive damages of at least $37,275,000, to be determined at trial, and reformation of Amendment 2 to the Contract to provide for payment to TES of the full unpaid amount of its invoices for food services at its DFAC sites;

Count 3: $7,759,473 in compensatory damages, plus interest continuing to accrue until paid;

Count 4: $61,359.00 in compensatory damages, plus interest of at least $97,755 continuing to accrue until paid;

Count 5: $89,715 in compensatory damages, plus interest of at least $34,166, continuing to accrue until paid;

33

Count 6: $59,916 in compensatory damages, plus interest of at least $19,379, continuing to accrue until paid;

Count 7: $2,960,706 in compensatory damages, plus interest of at least $1,086,415, continuing to accrue until paid;

Count 8: $153,765 in compensatory damages, plus interest of at least $48,990, continuing to accrue until paid;

Count 9: $250,000 in compensatory damages;

Count 10: Punitive damages of at least $2 Million, to be determined at trial;

Count 11: Punitive damages of at least $25 Million, to be determined at trial;

costs; and such other and further relief that the Court deems just and proper.

January 24, 2008

Respectfully submitted,

Susan L. Schor
Virginia Bar No. 28623
Attorney for Paul Morrell, Inc. d/b/a The
   Event Source
McManus, Schor, Asmar & Darden, L.L.P.
1155 15th Street, N.W.
Suite 900
Washington, D.C. 20005
Telephone: (202) 296-9260
Facsimile: (202) 659-3732
sschor@msadlaw.com