IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| PAUL MORRELL, INC. d/b/a THE EVENT SOURCE, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:08cv72 (AJT/JFA) |
| | ) | |
| KELLOGG BROWN & ROOT, INC., *et al.*, | ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION

The trial of this case took place without a jury from May 7, 2009 through June 2, 2009.[1] Both parties have submitted proposed findings of fact and conclusions of law. Having considered the evidence and arguments presented at trial, the Court concludes that as to Count 1, judgment will be entered in favor of Defendant Kellogg Brown & Root Services, Inc. and Defendant Kellogg Brown & Root LLC and against Plaintiff Paul Morrell, Inc. d/b/a The Event Source, both as to Plaintiff's breach of contract claim and also its tortious interference claim. The Court further concludes that as to Count 2 alleging fraudulent misrepresentation, judgment will be entered in favor of Plaintiff Paul Morrell, Inc. d/b/a The Event Source and against Defendants in the amount of $12,424,387 in compensatory damages, together with prejudgment interest, calculated at a rate of 5% from December 21, 2005, and $4 million in punitive damages.

---

[1] Plaintiff's Amended Complaint originally asserted 11 Counts, all but two of which, Counts 1 and 2, were resolved before trial.

In support of this verdict, the Court issues the following Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52(a).

## I.    FINDINGS OF FACT[2]

1.    This case takes place against the backdrop of the Iraqi War and the need to establish dining facilities and food services for American troops in Iraq, referred to as "DFAC" services.

2.    Plaintiff Paul Morrell, Inc. d/b/a The Event Source ("TES") is a corporation organized under the laws of Utah, with its principal place of business in Salt Lake City, Utah. Paul Morrell is a fifty percent owner of TES and at all material times herein, served as TES' President. Phil Morrell, the brother of Paul Morrell, is also a fifty percent owner of TES and at all material times herein, served as TES' Chief Executive Officer.

3.    Defendant Kellogg Brown & Root Services, Inc. is a Delaware corporation with its principal place of business in Houston, Texas. Defendant Kellogg Brown & Root LLC is the successor in interest to Defendant Kellogg Brown & Root, Inc. by virtue of a series of mergers effective as of December 31, 2005 and is a Delaware limited liability corporation with its principal place of business in Houston, Texas. (Defendant Kellogg Brown & Root Services, Inc. and its successor Kellogg Brown & Root LLC are referred to collectively as "KBR.") Defendant Kellogg Brown and Root International, Inc. is a Delaware corporation with its principal place of business in Houston, Texas.

---

[2]  The Court has also included certain findings of fact in support of specific conclusions of law in Part II, herein.

## The LOGCAP III Contract between KBR and the Government

4.    On or about December 14, 2001, the United States ("the government") awarded to KBR a contract referred to as the Logistics Civil Augmentation Program III Support Contract ("the LOGCAP III contract").[3] Defendant Exhibit ("DX") 253.

5.    Under the LOGCAP III contract, KBR agreed to provide certain logistical support for American troops in Iraq, including DFAC services at between 50 and 60 sites in Iraq. The original period of performance for the LOGCAP III contract was one year with up to nine, one year option periods. The LOGCAP III contract itself did not award any work to KBR or obligate the government to award to KBR any work pertinent to this litigation. The LOGCAP III contract also expressly reserved to the government the right to decide whether to extend the original period of performance.

6.    On June 13, 2003, the government awarded work to KBR under the LOGCAP III contract through Task Order 59. Task Order 59 required that KBR provide, among other things, DFAC services in Iraq.[4]

7.    The government originally awarded Task Order 59 as a "cost plus award fee" ("CPAF") contract, under which KBR was entitled to be reimbursed for its allowable costs, which included its overhead and administrative costs, a base fee of 1% of the

---

[3] Brown & Root Services, a division of Defendant Kellogg Brown & Root, Inc., was initially awarded the LOGCAP III contract on or about December 14, 2001. The LOGCAP III contract was modified effective December 14, 2003 to substitute Defendant Kellogg Brown & Root Services, Inc. as the contracting party.

[4] Although the original period of performance for Task Order 59 was 365 days, the originally estimated period of performance was funded only from June 13, 2003 to September 11, 2003. Subsequent funding was in increments of only a few months; and the government made periodic modifications to Task Order 59 with respect to the scope of work and funding for KBR's work as the war continued and it determined the need to continue KBR's services.

negotiated estimated costs that the government and KBR agreed upon, plus a discretionary award fee of up to an additional 2%, determined unilaterally by the government based on the government's consideration of a number of factors including KBR's efforts to reduce costs. The LOGCAP III contract also provided that the government could, through negotiations, convert contracts awarded pursuant to it, such as Task Order 59, or portions of those contracts, from a CPAF contract to a "firm fixed price" ("FFP") contract, under which a profit rate of 3% would apply in lieu of its base and discretionary fees. As discussed below, in the spring of 2005, KBR and the government negotiated such a conversion of that part of Task Order 59 that dealt with DFAC services.

## The contract between KBR and TES

8.      Under its contract with the government, KBR was required to ensure that DFAC services continued to be available for as long as the troops needed to be fed. In order to provide the DFAC services required under Task Order 59, KBR decided to use outside vendors as subcontractors, even though the number of available, technically qualified companies was small. Because of its own contractual obligations to the government, KBR's subcontractors needed to mobilize and begin performing immediately, and also be available to continue performing for as long as the need for DFAC services existed. KBR also expected these subcontractors to provide the substantial capital costs associated with establishing DFAC services, including the costs associated with constructing facilities. Nevertheless, KBR did not want to commit contractually to subcontractors beyond its own task order commitments and funding from the government and foresaw the need to modify contractual arrangements after the initial period of performance in response to

4

changed circumstances. It also understood, however, that potential KBR subcontractors expected contractual arrangements to contain terms and incentives commensurate with the challenges and risks associated with establishing and providing DFAC services in a war zone. [5]

9.     In the spring of 2003, KBR identified TES as one of a handful of contractors technically qualified to provide the required DFAC services under Task Order 59. On June 17, 2003, KBR and TES entered into the Master Agreement LOGCAP-KU-MA004, effective June 15, 2003, which contained an integration clause but specifically referenced or otherwise attached or incorporated other contractual documents (collectively referred to as the "Master Agreement").[6] DX 3.

10.     The Master Agreement did not award any specific work to TES, obligate KBR to award initially any work to TES or commit KBR to pay any funds to TES. It also did

---

[5] During the trial, Paul Morrell described some of these risks that materialized in connection with providing DFAC services:

> We were having truck drivers get shot at. . . . We were
> having drivers being kidnapped from their homes if they
> were living locally. Their lives were threatened, their
> families were threatened. . . . I had sniper dots on me a
> couple times as I was driving between sites at night.
> Luckily nobody ever killed me. But some of my staff did
> get killed. It was a very, very dangerous environment.

Paul Morrell Trial Testimony 702:4-16.

[6] These other contract documents included initially: (1) the Master Agreement Scope of Work ("Scope of Work"); (2) the Subcontract General Conditions ("General Conditions"); (3) the Brown & Root Services – LOGCAP Purchase Orders/Subcontract Special Requirements for Overseas Subcontractors in support of Contract No. DAAA09-02-D-0007 ("Special Conditions"); (4) the Work Releases executed under the Master Agreement; and (5) Change Orders to the Master Agreement. The parties subsequently entered into Work Releases, change orders, and Amendment Nos. 1 and 2 to the Master Agreement, discussed *infra*.

not specify the scope of any actual work that might be awarded, the pricing for that work, or the locations for the DFAC services to be provided. Rather, the Master Agreement contemplated that a Work Release would specify "the specific scope of work, location(s), duration(s), applicable rates, the terms of payment and any special conditions related to the WORK to be undertaken." DX 3 (Master Agreement) at § 1.1.5. KBR became obligated "only in the event of an authorized WORK RELEASE issued under the Master Agreement by an authorized [KBR representative]." *Id.* at § 23.1.

11.     On June 24, 2003, KBR issued to TES what was referred to as a Request for Plan of Execution of Project ("RFPEP") with respect to DFAC services. In this RFPEP, KBR directed TES to assume, in preparing its proposed pricing, that the "period of performance shall be 180 days with three (3) 180 day option periods to extend." Plaintiff Exhibit ("PX") 158, Tab 15 at Attachment "B." KBR also told TES, and other vendors, that because the need for DFAC services might not extend beyond the initial six month performance period, given the uncertainties of the war effort, their prices should be sufficient to recoup during that initial performance period all their costs, including capital costs for facilities and equipment, particularly since once set, prices would not be adjusted during the initial performance period.

12.     Following TES' execution of the Master Agreement and TES' specific proposals that KBR had solicited,[7] KBR awarded to TES the subcontract to provide DFAC services

---

[7] In its proposals, TES provided a per person, per meal, per day ("PPPD") price, calculated both with and without food furnished by TES, and also proposed a minimum "floor" with respect to the number of meals that would be paid for per day at each site. Consistent with KBR's guidance on pricing, TES' pricing was intended to allow it to recover all of its costs within the initial period of performance. TES provided no pricing for any of the option periods.

at the H-1, H-2, H-3, H-4, and H-5 sites (the "H sites")[8] and the Baghdad International Airport, known as the D-5.1/BIAP site.

13.    Beginning in August 2003, KBR and TES entered into six Work Releases,[9] which set forth the specific scope of work and other applicable terms for each of the H sites and the BIAP. TES' period of performance at each site was approximately six months;[10] and TES was entitled to charge for a minimum number of meals, referred to as a service "floor," regardless of the number of persons actually served at a site.

14.    TES used its own subcontractors to provide the required DFAC services at all of its sites except the BIAP.[11] Specifically, TES subcontracted with Akfen Construction Touring and Trading, Inc. ("Akfen") at sites H-1 and H-4; ABC International Group,

---

[8] Reflecting the urgency of the situation, KBR had given TES a verbal commitment for an award of the H sites before receiving TES' bids.

[9] KBR and TES executed the following Work Releases for TES to mobilize, construct, and operate DFACs:

   a.  Work Release 2 for the D-5.1/BIAP site, with an effective date of June 28, 2003
   b.  Work Release 4 for Site H-1, with an effective date of July 15, 2003
   c.  Work Release 5 for Site H-2, with an effective date of July 15, 2003
   d.  Work Release 6 for Site H-3, with an effective date of July 15, 2003
   e.  Work Release 7 for Site H-4, with an effective date of July 15, 2003
   f.  Work Release 8 for Site H-5, with an effective date of July 15, 2003.

PX 158, Tab 10; DX 6.

[10] The Work Releases specifically provided that the "Time of Performance" at the H sites was to "complete and demobilize on" February 28, 2004 at H-1, February 25, 2004 at H-2, February 14, 2004 at H-3, February 21, 2004 at H-4, and February 22, 2004 at H-5. DX 6. The agreed duration did not extend beyond February 28, 2004 at any of the H sites.

[11] At the BIAP, TES initially used two different subcontractors, but after terminating those subcontractors, self-performed at that site until KBR terminated TES for convenience in July 2004.

W.W.L. ("ABC") at site H-2; and Alargan Trading Est. ("Alargan") at sites H-3 and H-5. TES' contracts with its own subcontractors mirrored in major respects the Master Agreement and continued so long as KBR and TES were under contract. Pursuant to these subcontracts, TES' subcontractors financed through their per person, per day pricing large portions of the DFAC operations, including construction of the actual dining facilities at each site.

## KBR'S decision to rebid its DFAC subcontracts

15.     By the fall of 2003, KBR concluded that additional technically qualified companies had become available to provide DFAC services and that more favorable pricing might be obtainable. During that same period, KBR came under increasing scrutiny and criticism from the Defense Contract Audit Agency ("DCAA") concerning the DFAC invoices KBR was submitting from its DFAC subcontractors, principally on the grounds that it appeared that some DFAC invoices billed for more meals than were actually served. For these and other reasons, KBR wanted to review and reduce its DFAC costs by evaluating and comparing its existing subcontractors' costs and then, based on its findings from that review, determining a range in which it could negotiate uniform pricing for all of its DFAC subcontracts.

16.     In the fall of 2003, KBR and TES began discussions about the next period of performance. In October 2003, as part of those discussions, KBR requested and TES provided its cost data as part of what TES understood to be the beginning of negotiations concerning pricing after the first six month period of performance.

17.     In late January 2004, KBR notified TES that KBR was going to re-bid the H sites for the period after the first six months. In February 2004, TES submitted new pricing proposals for the H sites.[12]

18.     TES' revised pricing during the re-bidding process was substantially higher than almost all of the other proposals KBR received, although lower than the amount TES originally bid in 2003. TES' new bid for the H-1 site was $12.2 million higher than the winning bid; $10.5 million higher for H-2; $11.4 million higher for H-4; and $2.4 million higher for H-5. Overall, TES was the highest bidder for all of the H sites except for the H-3 site, as to which it was the second highest bidder.

19.     KBR selected the low bids submitted during the re-bidding process and did not extend or renew any of TES' subcontracts for its previously awarded H sites. Instead, KBR awarded all of the H sites to TES' own subcontractors or sub-subcontractors. Specifically, KBR awarded the new subcontract for the H-1 site to TES' subcontractor Akfen; the new subcontracts at H-2 and H-4 to TES' subcontractor ABC; and the new subcontracts at H-3 and H-5 to TES' sub-subcontractor Gulf Catering Company ("GCC"). As a result of these new subcontracts, KBR expected to lower its DFAC costs at these sites by more than $40 million.[13]

20.     As of the time that KBR awarded the H sites to TES' subcontractors, the LOGCAP III contract remained in effect, the Master Agreement between KBR and TES

---

[12] KBR's statement of work in its request for new DFAC site proposals initially contained language suggesting that TES would be replaced in any event. However, in response to TES' protests, KBR invited TES to bid on the new DFAC contracts at the H sites, along with other vendors.

[13] DCAA later concluded that the cost of DFAC services at these sites was reduced by more than $67.6 million.

had not expired, and KBR had not terminated the Master Agreement.[14]  KBR also had

not terminated the Work Releases for the H sites, although the initial period of

performance set forth in those Work Releases had expired. [15]  Likewise, TES had not

terminated its own vendors at the time KBR entered into subcontracts directly with those

TES subcontractors.

### KBR's billing disputes with the United States and its Settlement with the United States

21.    During late 2003, DCAA began reviewing the pricing under KBR's DFAC

subcontracts issued under Task Order 59, including TES' subcontracts and invoices.  In

early 2004, DCAA informed KBR that, notwithstanding the terms of its competitively bid

subcontracts, including its subcontract with TES, under which TES was entitled to

receive minimum payments regardless of the actual number of soldiers served, DCAA

would, pending further discussions, withhold payment on any amounts invoiced  for

meals served that exceeded the actual number of persons served.  DCAA therefore

insisted that KBR undertake a review of its DFAC subcontracts and that during that

review KBR not bill the government for certain DFAC invoices.

---

[14] On July 1, 2004, KBR issued to TES a termination for convenience with respect to the
BIAP, Site D-5.1, effective July 15, 2004, after extending the performance period at the
site twice.

[15] On February 20, 2004, KBR requested that TES continue to provide DFAC services at
H-1, H-2, H-4, and H-5 for a short time so that KBR could complete its evaluation of the
proposals and make the appropriate awards.  In requesting the continuation of TES'
services, KBR did not award TES another 180-day work release at those sites, but rather
sought brief additional performance from TES under the existing Work Releases.
Although under no contractual obligation to do so, TES agreed to continue working as
requested by KBR with the understanding that KBR had not renewed the previously
issued Work Releases pertaining to those sites.

22. Starting in February 2004, KBR complied with DCAA's request, conducted a comprehensive review of all of its DFAC subcontracts, and provided the results to DCAA. Based on its review and analysis, KBR concluded that its DFAC subcontracts were reasonably priced and structured and that the outstanding invoices should be paid in full. After providing DCAA with its conclusions based on its review, KBR informed DCAA that it would begin paying outstanding subcontractor invoices in full and billing those amounts to the government.

23. In May 2004, in response to KBR's declared intention to pay the outstanding invoices of its DFAC subcontractors and submit those invoices to the government for reimbursement, DCAA began issuing several "Form 1" directives for the Army to withhold and/or recoup 19.35% of the total payments made by the Army to KBR for DFAC invoices, including those of TES. DCAA issued the Form 1 on the grounds that KBR's subcontractor DFAC invoices included amounts for meals that exceeded the actual number of persons served.[16]

24. When the government began withholding money from KBR, KBR, in turn, began withholding money from its subcontractors pursuant to the "pay when paid" provision of the Master Agreement. Specifically, KBR informed TES that KBR would withhold an amount equal to 19.35% of all of its DFAC invoices.[17]

---

[16] DCAA explained in the Form 1 for Task Order 59, under which TES performed, that the 19.35% decrement factor was developed based on an analysis of 155 invoices and "represents the difference between the headcount billed on those invoices and the highest actual daily headcount from situation reports." PX 15 at 2.

[17] As of the time that KBR first notified TES of the 19.35% holdback on all of its invoices, TES had ceased its operations at its five H sites, and was continuing to perform and invoice KBR for work only at the D-5.1 (BIAP) site in Baghdad. KBR therefore withheld from the BIAP invoices an amount sufficient to bring to 19.35% the total

25.    On June 24, 2004, following and in response to the government's imposition of

the 19.35% holdback, KBR and TES executed Amendment No. 1 to the Master

Agreement. In Amendment No. 1, KBR and TES agreed on a method to calculate the

outstanding amount due and payable to TES, subject to the "pay when paid" provision of

the Master Agreement. Pursuant to that agreement, the parties ultimately agreed in the

fall of 2004 that $36,464,644.65 was the proper amount to be invoiced by TES for its

DFAC services.

26.    The Master Agreement required TES to provide to KBR written notice of claims

within ten (10) days after TES obtains knowledge of the facts giving rise to the claim. In

section 3.1 of Amendment No. 1, the parties extended the time for TES to file claims

with KBR:

> For the period of time beginning on the Effective Date
> [June 15, 2003] and ending on the last day of the Term [90
> days after the Amendment Date] ("Waiver Term"), KBR
> agrees to waive all contractual provisions in the Master
> Agreement that require TES to submit a claim to KBR, to
> Alternative Dispute Resolution ("ADR"), or otherwise
> within a certain period of time. Without limiting the
> foregoing, KBR agrees to waive during the Waiver Term
> the provisions of Section 8 of the Subcontract General
> Conditions of the Master Agreement [10 day filing
> requirement], and Section 4.5 of the Subcontract Special
> Conditions for Overseas Subcontracts of the Master
> Agreement [15 day filing requirement].

PX 182.

27.    Following the execution of Amendment No.1, the parties further extended the

---

holdback as to all sites, resulting in a much higher holdback from the BIAP invoices than
19.35 %. Because TES had already paid its own H site subcontractors from the funds it
had previously received from KBR before the imposition of the 19.35% holdback, TES
had, in the aggregate, paid to these subcontractors more than they were then owed by
TES under their subcontracts since under their contracts with TES they were entitled to
receive payment only to the extent TES received payment on their invoices from KBR.

Waiver Term on several occasions, as set forth in a series of communications between TES and KBR.[18] As reflected in these communications and the parties' understandings based on those communications, the parties agreed that after the expiration of the Waiver Term TES would have either 10 days under Section 8 of the General Conditions or 15 days under Section 4.5 of the Special Conditions within which to assert claims under the Master Agreement. The Waiver Term was ultimately extended through June 15, 2005; and TES filed written claims with KBR on June 24, 2005, within the ten day limit.

28.     In the fall of 2004, the government, through the Army Sustainment Command ("ASC"), formed a Special Cost Analysis Team ("SCAT") to examine the DFAC costs under Task Order 59. In January 2005, negotiations between ASC and KBR began over the outstanding DFAC invoices. In this regard, KBR had presented to the government invoices for DFAC services that totaled approximately $1.179 billion, $211,550,731 of which the government had suspended, including $36,464,644.65 KBR was withholding from TES based on the final TES invoices agreed to by KBR and TES. *See* PX 51 (Amendment No. 2 to Master Agreement).

29.     ASC initially proposed addressing only the 28 DFAC sites funded under Task Order 59; but as the discussions progressed, ASC and KBR decided to attempt a global resolution of all billing issues pertaining to all of the 56 DFAC sites that were the subject of 15 task orders.

30.     As the discussions progressed, ASC also decided to negotiate the DFAC subcontract billing dispute separately from KBR's other costs under those task orders and

---

[18] TES expressly set forth its understanding that the expiration of the Waiver Term would trigger a period of time after such expiration within which claims could be submitted or the Waiver Term could be extended. KBR responded "Agreed." PX 158 at Tab 3.

to resolve KBR's claims for DFAC subcontract costs by converting that portion of the applicable task orders from a cost plus contract to a firm fixed price arrangement. Part of ASC's motivation for this approach was to avoid the need to examine the specific invoices for each DFAC site in order to determine the precise amount payable as to each site under the terms of KBR's contract with its subcontractor for that site.

31.     In order to justify the reasonableness of any overall fixed price settlement with respect to DFAC services, ASC used what was referred to as a "parametric computer model."[19] As a general proposition, this computer model calculated the cost for DFAC services under certain assumptions. Those computer generated costs were then compared to the amount that KBR had submitted for DFAC services in order to arrive at a number by which the invoiced costs for DFAC services should be reduced, a number referred to as the "decrement."

32.     KBR and ASC exchanged negotiation positions and settlement offers through proposed variables that would be used by the parametric model to generate a cost for DFAC services. Over time, KBR and ASC agreed upon what variables or factors would be used.

33.     The model, as finally adopted by ASC and KBR, took into account a range of factors.[20] However, the model did not incorporate the actual number of meals actually

---

[19] The government created the initial model for the purpose of analyzing the cost difference between invoiced and actual headcount at those sites included within Task Order 59. KBR hired consultants in February 2005 to "recalculate" and validate the government's model as to Task Order 59, and through their efforts reproduce, or "reverse engineer" the model to change variables or add its own new variables in order to calculate overall amounts. KBR also replicated the model across other task orders.

[20] The parametric model, as adopted for the purposes of generating overall amounts for DFAC services, incorporated factors or variables that were both site-specific and non-site

served at a particular site or the "floors" that applied under KBR's contractual arrangements with TES or other subcontractors, regardless of the number of meals actually served.[21] For these reasons, the government did not regard the calculations generated by the model as statistically reliable on a site-by-site basis; and KBR did not even consider whether the model was statistically reliable on a site by site basis.

34.      On March 28, 2005, after extensive negotiations based on offers and counteroffers generated by the model using different values for different factors,[22] ASC offered to enter into a firm fixed price contract for KBR's invoiced DFAC services for a decrement against those invoices of $51.4 million. That offer included a charge of approximately $18.75 million for food that the government claimed it had contributed to DFAC sites ("GFE"), without any specificity or documentation as to which sites or which subcontractors received the GFE. That offer was also conditioned on KBR's accepting a

specific These variables included: (1) the number of persons that KBR was required to serve at a particular site, as stated in KBR's "Statement of Work" under its contract with the government; (2) the subcontractor's "per person, per day" rate that was used to compensate the subcontractor for meals served; (3) the number of days that a subcontractor performed at a site; (4) a "portion control factor"; (5) a "meal utilization factor" ("MUF") for breakfast, lunch and dinner, which resulted in a percentage by which all subcontractor invoices were reduced; (6) MUF's weighted averages for how each meal would factor into decrement calculations (the "20-40-40 split"); (7) food/non-food splits; (8) periods of time over which the rate of reimbursement to the subcontractors would change; and (9)"government furnished food," referred to as "GFE."

[21] There were, in fact, sites where more troops were fed than the number used for that site in the model, including certain of TES' sites, and there was nothing in the model that captured those actual headcounts. The model also did not account for TES' meals served at its satellite facility at the H-2 site, for which TES had invoiced.

[22] For example, the government offered a reduction or "decrement" against outstanding invoices of 14.04% on January 26, 2005, and 10.85% on January 30, 2005. KBR offered a decrement of $24.9 million or 2.12%. On March 10, 2005, ASC offered a decrement of $65.3 million. KBR then made a counter-offer of a $25 million decrement, subsequently revised to $37 million. On March 18, 2005, the government responded with an offer of a $59.8 million decrement.

profit of 2.64% on its total DFAC costs rather than the 3% KBR believed it was entitled to under a "fixed price" arrangement.

35.     KBR was not willing to accept a profit rate below 3% as part of any overall settlement of DFAC invoices and asked ASC to calculate an overall decrement that would allow ASC to give KBR a profit on DFAC costs of 3% as opposed to 2.64%.

36.     ASC was not willing to increase its overall payments with respect to DFAC services in order to give KBR a profit on DFAC services above 2.64%.  For that reason, ASC was willing to increase KBR's profit on the $1.179 million of DFAC billings from 2.64% (approximately $30 million) to 3% (approximately $34 million) only through an additional $4 million decrement against KBR's outstanding DFAC invoices, that is, by increasing its holdback or decrement on DFAC subcontractor invoices from $51.1 to $55.1 million. [23]   KBR accepted this proposal and KBR and ASC signed a settlement

---

[23] The $51.1 million offer was part of the following ASC calculation:

| | |
|---|---|
| Billing Universe (Total submitted DFAC invoice): | $1,179,272,398 |
| Initial Decrement: | **51,142,423** |
| Allowable base: | 1,128,129,975 |
| Overhead/G&A expense, Calculated at 2.1183% | 23,897,460 |
| Subtotal: | 1,152,027,434 |
| KBR's fee at 2.64% | **30,413,524** |
| | |
| Total Price to be paid to KBR by government | **$1,182,440,959** |

The  final settlement between KBR and the government was calculated as follows:

| | |
|---|---|
| Billing Universe: | $1,179,272,398 |
| Settlement Decrement: | **55,085,402** |
| Allowable Base: | 1,124,186,996 |
| Overhead/G&A expense, calculated at 2.1183% | 23,813,935 |
| Subtotal | 1,148,000,931 |

16

agreement dated March 31, 2005, together with an April 29, 2005 Addendum to that Agreement (the "KBR-ASC settlement" or the "government settlement"). PX 12; PX 22. Under that settlement, KBR agreed to a "direct cost decrement" against DFAC invoices of $55,085,402. [24]

37.     The KBR-ASC settlement required KBR to pay to its DFAC subcontractors in the aggregate "a minimum of the settlement direct cost amount ($1,179,272,398) less the $55,085,402 agreed upon decrement," and stated that any such amount not paid to DFAC subcontractors in the aggregate within "6 months of the detailed reconciliation and finalization of the billing universe" would be refunded to the government. PX 12 at 5(a). In addition, KBR released the government from all claims relating to the DFAC invoices, including those pertaining to TES' invoices, and also converted the LOGCAP III contract and related task orders, insofar as they pertained to the DFAC services, from a cost reimbursement contract to a firm fixed price contract.

38.     The practical effect of the KBR-ASC settlement was that KBR no longer had the ability to assert claims on behalf of its subcontractors for any additional payment for DFAC services and the sole remedy of those subcontractors with respect to their outstanding, unpaid invoices was against KBR. As KBR acknowledged, KBR was "at risk" for any "over recovery" by its DFAC subcontractors.

| | |
|---|---|
| KBR's fee at 3%: | **34,440,028** |
| Total Price to be paid to KBR by government: | **$1,182,440,959** |

PX 8.

[24] The decrement of $55.1 million consisted of: (1) $32.4 million that was generated by the parametric model; (2) a lump sum of $18.75 million for GFE food; and (3) $4 million to account for the additional KBR profit.

39.     In connection with the KBR-ASC settlement, the government prepared a spreadsheet that allocated the $55.1 million decrement [25] across the various task orders by specific sites, known as the "Maynard Schedule."[26] This allocation was necessary as part of the internal accounting and reconciliation required to convert the DFAC task orders from a CPAF to a FFP contract.

40.     Before entering into the KBR-ASC settlement, KBR did not consult with TES concerning the KBR-ASC settlement or the settlement amount; nor did it disclose any details about the settlement.  As with the KBR-ASC settlement generally, TES never authorized KBR to waive any rights or compromise any entitlements on its behalf and KBR never sought any such authorization.

### The KBR-TES settlement meetings in Dubai.

41.     Following the KBR-ASC settlement, KBR scheduled meetings with its DFAC subcontractors in Dubai for the purpose of resolving their outstanding invoices.  For that purpose, and upon the recommendation of Jill Pettibone, KBR's chief negotiator with the government after approximately March 8, 2004, KBR assembled a team that consisted of Pettibone, Paul Cerjan, Vice President, Program Manager, LOGCAP III-Middle East/Central Asia, Mike Hatch, an in-house lawyer for the Middle East Region, and

---

[25] TES' sites were allocated $12,424,387.71 of the total $55,085,402 decrement, or 22.56%.  The $18.75 million GFE credit and $4,026,504 KBR profit increase were allocated to the TES sites in the same proportion, resulting in an allocation to TES' sites of $4.23 million for GFE and $908,379.30 for KBR's increased profit, neither of which amount had anything to do with TES' DFAC invoices or its contractual arrangement with KBR.

[26] While the "Maynard Schedule" was a specific document allocating the agreed upon decrement to each DFAC site, the parties in this litigation referred to the "Maynard Schedule" more generally as the amount allocated for DFAC services at each site under the settlement.

18

Daren Woodard, Manager, DFAC Procurement & Supply (collectively, the "KBR team"). Pettibone was the only person on the KBR team that had been involved in the KBR-ASC settlement negotiations or had actually seen the settlement agreement with the government.[27]

42.     Before the meetings with KBR's subcontractors, KBR discussed internally how to deal with its DFAC subcontractors in order to resolve their outstanding DFAC invoices. For that purpose, Pettibone prepared a memorandum with recommendations about the upcoming negotiations for KBR's Director of Government Compliance, the head of the Government Operations Division (also known as Government and Infrastructure), and a senior counsel for the Government Operations Division.

43.     In order to prepare the other members of the KBR team for their meetings with KBR's DFAC subcontractors, Pettibone also prepared "talking notes" that outlined what would be told to the subcontractors and met with the KBR team to go over the "talking notes" and how the meeting with the subcontractors should be conducted. Pettibone also drafted talking notes specific to TES, which included, in part, the following that the KBR team should say to TES:

> The US Army has made a decision on the DFAC billing issue. The [sic] have determined appropriate amounts for each individual DFAC. . . . We are paying vendors no more nor no less than what the client [the government] says should be paid for each site. The Government has analyzed

---

[27] Woodard did not testify, but both Cerjan and Hatch testified that they were not involved in the KBR-ASC negotiations leading up to the KBR-ASC agreement, that neither had seen the KBR-ASC settlement, that they relied on Pettibone for their information, and that they assumed that TES' remedy was against the government. However, Pettibone had complete knowledge and understanding of the KBR-ASC settlement, how it was arrived at, and the factors that when into it, particularly given her 27 years working within the Department of Defense on matters pertaining to government contracts before joining KBR.

> each DFAC separately . . . The Government's decision is
> site specific. . . . If you are unwilling to sign the [release of
> claims] then you have not satisfied the conditions for
> receiving payment. If you refuse to accept this as the final
> payment, it is KBR's position that you need to exercise
> your options under the Dispute clause of the subcontracts.

DX 61 (Talking Notes).

44.     By e-mail dated April 15, 2005, Paul Cerjan contacted TES to propose a meeting:

> As you have undoubtedly heard, the US Army has come to a
> decision on the DFAC issue. The Government is preparing to
> refund a substantial amount of money that it is withholding for
> DFAC services.
>
> We would like to meet with you to discuss the Government's
> decision and payment as it relates to your subcontracts.

PX 42.

45.     The KBR team met with the TES team in Dubai on April 21 and 22, 2005 (the

"Dubai meetings"). Cerjan acted as the chief spokesperson for the KBR team. The TES

team consisted of Paul Morrell, President of TES, Kimball Shill, then TES' chief

operating officer, Greg Bishop, TES' counsel, and Marty Petersen, TES' chief financial

officer. At the meeting, KBR offered to settle TES' outstanding claims for DFAC

services for the additional payment of $24,040,256.94.[28] This amount was arrived at by

subtracting $12,424,387 (the portion of the $55.1 million decrement that had been

allocated to TES' DFAC sites in the Maynard Schedule) from $36,464,644, the unpaid

amount that KBR and TES had previously agreed was properly billed to KBR. At that

meeting, KBR also delivered a letter dated April 21, 2005. That letter confirmed, *inter

alia*, that the government "had reached a decision concerning the DFAC billings" and it

---

[28] KBR initially offered approximately $2 million less, but later increased the offer after
TES pointed out certain mathematical errors on the Maynard Schedule.

also referenced Article 3 of the Special Conditions of the Master Agreement, titled Disputes, which required KBR, upon TES' request, to pursue against the government any appeals by TES from any contested government decision.

46.     In response to KBR's settlement offer, TES told KBR that before it would accept KBR's offer, it wanted a copy of the "model" that was used to generate what the government had determined was owed to TES. TES also wanted written confirmation from KBR that the government had, in fact, made a "decision" with respect to TES' invoices and that the government had "instructed" KBR to pay the amount, and only that amount, offered by KBR as a final settlement with TES. KBR refused to provide the model but agreed to provide written confirmation of its representations; and on or about May 2, 2005, the parties entered into Amendment No. 2 to the Master Agreement (PX 51), in which KBR confirmed certain representations, including specifically the following:

> "...*the Government has reached a decision* concerning the amount of the Government Holdback that it will refund to KBR, *including the amount of the KBR Holdback that KBR will refund to TES*." (PX 51 at 1) (emphasis added);

> "...the Invoiced Work [TES' invoices to KBR pertaining to its DFAC services] represents the amount billed by TES to KBR..., **reviewed by the Government**."

> "KBR represents and warrants that the "KBR Holdback" (defined below in Section 4) [i.e., the difference between the total amount of outstanding TES invoices and the amount that KBR was offering to pay] *was calculated by the Government* based on a number of factors, *primarily including actual headcount and the period of performance, and that KBR has no ability to increase or decrease the KBR Holdback*." (PX 51 at 2, ¶ 3) (emphasis added);

> "The KBR Holdback means that portion of the amount
> billed for the Invoiced Work that will not be paid to TES *as
> determined by the Government . . ."* (PX 51 at 2, ¶ 4)
> (emphasis added).

47.     Some of KBR's representations to TES were also confirmed in draft letters that

were attached to Amendment No. 2, to be signed by Paul Cerjan and sent by KBR to

TES' subcontractors. Each draft letter stated in pertinent part:

> As you know, the United States Government
> ("Government") has been conducting a review into the
> invoicing methodology (as well as the actual invoices
> submitted by KBR) with respect to the food services
> provided at a number of dining facilities in Iraq
> ("DFACs"), including those operated for KBR by TES.
> *After an extensive review, the Government concluded that
> the proper methodology is to pay DFAC invoices based on
> (a) the number of people that were actually fed and (b)
> the period of performance.*
>
> *             *             *
>
> We are pleased to inform you that *the Government's
> review of each DFAC is now complete*, and that with
> respect to the [_____] site, *the Government has instructed
> us to pay* [_____] % of the total amount invoiced by TES (in
> other words, *the government has decreased the total
> amount invoiced by TES by [___] %*)

PX 51 (emphasis added).

48.    Under Amendment No. 2, TES accepted the sum of $24,040,256.94 as final

payment on its DFAC invoices and agreed to release KBR "from all claims for payment

of the Sublet Work identified in the Invoiced Work." PX 51 (Amendment No. 2) at §

6.3. TES did reserve the right to bring a claim against KBR "for any matter unrelated to

the Government's review of the Invoiced Work." *Id.* at § 7.

49.    Based on all the evidence, the reasonable inferences therefrom and the Court's

assessment of the credibility of witnesses, the Court finds that at the Dubai meetings,

KBR told TES the following: [29]

    (a) The government had made a unilateral "decision" with respect to the

outstanding DFAC invoices, without telling TES that there had been a negotiated

settlement. Even KBR's most senior representative at the Dubai meetings who served as

KBR's principal spokesperson, Paul Cerjan, testified that there was no discussion at the

Dubai meetings about a government settlement and that if KBR had released the

---

[29] KBR does not disputes much of what TES contends KBR said at the Dubai meetings.
In particular, KBR admits that it told TES (1) that the government had made a "decision"
with respect to the outstanding DFAC invoices, without telling TES that there had been a
negotiated settlement; (2) that the government had determined what needed to be paid to
TES; (3) that the government's determination was site specific based primarily on "actual
headcount"; (4) that the government had "instructed" KBR to pay these amounts to TES;
(5) that KBR was required to follow the government's decision, without any discretion to
raise or lower the amount offered and that the amount offered was therefore "non-
negotiable;" (6) that in order to receive the amount offered by KBR, TES was required to
release KBR with respect to any other claims and to sign the affidavit required under
their subcontract as part of the "close-out" of the contract; and (7) that a $55.1 million
decrement was the "best deal" offered by the government. KBR contends, however, that
what it told TES was true and that, in any event, TES did not reasonably rely on what
KBR said. In that regard, KBR also contends that TES knew from press reports that it
had reached a "settlement" with the government and that it was entitled to receive a 3%
fee as part of its contract with the government. The parties' principal dispute about what
was said relates to TES' remedy in the event it rejected KBR's offer, with KBR claiming
that it told TES at the Dubai meetings that its remedy was against KBR, not the
government.

23

government by way of a settlement, much of what KBR was telling TES would have been "ineffective."

(b) The government had determined the specific amount to be paid to TES.

(c) The government's determination of the amount to be paid to TES was site specific based primarily on "actual headcount," although KBR did not know how the government arrived at that number.

(d) The government had "instructed" KBR to pay to TES the specific amount that KBR offered, no more or no less.

(e) KBR was required to follow the government's decision and instructions, without any discretion to raise or lower the amount offered and that the amount offered was therefore "non-negotiable."

(f) The overall decrement of $55.1 million was the "best deal" that KBR could obtain on behalf of the subcontractors and that the government would not have accepted any lesser reduction in the outstanding DFAC invoices.

(g) In order to receive the amount offered by KBR, TES was required to release KBR by signing the affidavit required under their subcontract upon receipt of a final payment as part of the "close-out" of their subcontract.

(h) In the event that TES rejected the KBR offer that it was instructed by the government to make, TES' only legal remedy was to contest the government's decision by filing a claim, through KBR, against the government. KBR's in-house counsel who attended the Dubai meetings conceded at trial that the reference to Article 3 in KBR's April 21, 2005 letter given to TES at the Dubai meeting meant that TES' remedy was against the government, not KBR.

50.     Based on the evidence, including the reasonable inferences therefrom and the Court's assessment of the credibility of witnesses, the Court finds that the statements made by KBR at the Dubai meetings, as set forth in paragraph 49 herein and in Amendment No. 2 were false and misleading.

(a) The KBR-ASC settlement was not a unilateral government decision and was not viewed by the government as such. Rather, KBR and the government negotiated and entered into a voluntary settlement with respect to DFAC services. KBR's characterization of that negotiated settlement as a government "decision" fundamentally misrepresented the nature of the government's action taken with respect to DFAC services. Any ambiguity about what KBR was representing as far as what the government had in fact done was eliminated by KBR's letter dated April 21, 2005, in which it advised TES that the government had made a "decision" for the purposes of Article 3 of the Special Conditions. Article 3 contemplates those situations where the government had in fact unilaterally determined how much was due and payable and not where, as here, KBR and the government agreed, after negotiations, on a total fixed price amount for all DFAC services and KBR released the government from any further liability with respect to those invoices.

(b) In the event that TES did not accept KBR's offer, TES' remedy was not against the government, through KBR, but against KBR, since by the time of the Dubai meetings KBR had already released the government from any further liability for DFAC services.

(c) The government had not calculated the amount properly payable to TES under KBR's subcontract.

(d) The government did not instruct KBR to pay TES a specific amount and the KBR–ASC settlement did not restrict KBR's ability to pay a greater or lesser amount to TES than what was allocated to TES' specific sites in the Maynard Schedule.

(e) The government did not calculate how much it should pay for DFAC services based "primarily on actual headcount." In fact, the actual headcount of persons served was not used as the basis for calculations that led to the KBR-ASC settlement and the numerous cost factors that were used had nothing to do with TES' actual cost experience at its sites. For example, approximately $22.75 million of the $55.1 million decrement, or over 40%, was simply a lump sum added to the overall decrement for items that had nothing to do with costs charged by TES, or the number of meals served.

(f) The government did not require TES to release KBR or sign the affidavit contemplated by the Master Agreement in connection with the close-out of their contract in order to receive the offered payment. Nothing in the KBR-ASC settlement required TES to provide to KBR an overall release of any further liability in order to receive a portion of the additional funds that KBR received through the KBR-ASC settlement.

(g) A decrement of $55.1 million was not the "best deal" that the government would accept with respect to DFAC services, but rather the "best deal" that KBR would accept since the government was willing to accept a decrement of $51.1 million, so long as KBR would accept a profit of 2.64%. KBR's claimed entitlement to a 3% profit did not make its representation true.

51.     The Court finds that KBR knew its statements described above were false, or made them recklessly as a positive assertion without any knowledge of their truth, and made these misrepresentations to TES with the intent that they be relied on by TES for

the purpose of inducing TES to enter into Amendment No. 2 to the Master Agreement, thereby eliminating KBR's exposure to additional millions of dollars in TES' DFAC claims.

(a) KBR knew that its characterization of the KBR-ASC settlement as a government "decision" was false. The KBR team at the Dubai meetings included at least one experienced government contracting professional who undoubtedly knew that KBR's characterization of what the government did as a government "decision" would be understood as something quite distinct from and different than the negotiated, fixed price settlement that KBR and the government entered into, as further evidenced, *inter alia*, by KBR's admitted expectation that the government would issue a unilateral decision concerning the amount payable for DFAC services if KBR and the government did not enter into the KBR-ASC settlement. KBR's reference to Article 3 of the Special Conditions in its April 21, 2005 letter distributed to TES confirmed that KBR was using the term "decision" to mean a unilateral, appealable decision by the government and something different than a voluntary, non-appealable negotiated settlement.

(b) KBR knew that if TES did not accept the KBR offer, TES' legal remedies were against KBR, not the government. KBR had released the government with respect to DFAC services and it knew that it had assumed the risk associated with negotiating a settlement with TES.

(c) KBR knew that the KBR-ASC settlement amount, either in the aggregate or as allocated to specific sites, was not based "primarily on actual headcount." Because of its involvement in the negotiations with the government, KBR knew in detail what factors

were used to calculate the settlement amount and that actual headcount at the specific sites was not the primary basis for the model's calculations.

(d) KBR knew that the government had not calculated a specific amount that KBR was required to pay to each subcontractor based on its DFAC invoices. In fact, KBR knew that the entire purpose of negotiating a fixed price for DFAC services in the aggregate was to avoid the need to calculate a specific amount properly payable to each of KBR's DFAC subcontractors on the basis of their invoices and contractual arrangement with KBR.

(e) KBR, through experienced government contracting representatives intimately involved in the negotiations leading up to the KBR-ASC settlement, knew that the government did not "instruct" it to pay a certain amount to TES and no more. Nothing in the KBR-ASC settlement or any of the negotiations would have led KBR to reasonably believe that it was instructed to pay a specific amount to TES or that it was prevented or restricted from paying to TES an amount different than the site specific amounts used to account internally for the settlement. In fact, KBR acknowledged internally before the Dubai meetings that it understood that the government did not view the KBR-ASC settlement as an instruction to KBR to pay TES a specific amount and that KBR had assumed the risk that it might need to pay more to its subcontractors than what it had received under its settlement with the government.

(f) KBR knew that the government did not require a release from TES in order to pay to TES a portion of the funds released to KBR for DFAC services under the KBR-ASC settlement. Because of its obligation to return to the government any unpaid portion of the $1.179 million minimum DFAC payment stipulated in the KBR-ASC settlement,

KBR also knew that as a practical matter it would likely pay TES what it was offering even without a release since KBR knew that such payments would reduce in any event its own out-of-pocket exposure to TES. KBR's own internal discussions recognized this possibility.

52.     The Court further finds that TES reasonably relied on KBR's misrepresentations and that TES' willingness to enter into Amendment No. 2 was related directly to KBR's misrepresentations. KBR's representation that the government unilaterally determined the amount to be paid to TES and its repeated references to the Disputes Clause caused TES to conclude that if TES were to seek more than what KBR was offering, TES' only remedy would be against the government. For a variety of reasons, TES was not willing to litigate against the government. In particular, TES knew that a claim against the government would need to be prosecuted through KBR and TES did not believe that KBR would adequately prosecute its claim. On the other hand, TES was fully prepared to pursue KBR, including through litigation, if necessary, over its outstanding DFAC invoices since, among other reasons, KBR had already acknowledged the amount that was properly payable to TES. TES questioned the accuracy of KBR's representations and, in response, KBR labeled as inaccurate certain news reports concerning a "settlement" with the government. KBR also provided written confirmation of certain of its representations in order to dispel any misgivings on TES' part. TES specifically conditioned its willingness to accept KBR's settlement offer and its willingness to release KBR based on receiving those assurances and entered into Amendment No. 2 only after receiving KBR's representations through KBR's legal counsel. While certain of TES' officers suspected that certain of KBR's representations were untrue (while others, such

as its general counsel, did not), TES did not, in fact, know at the time, and had no means of determining, that KBR's representations were untrue and it took reasonable steps, because of its suspicions, to ensure that they were true.

53.     The Court finds that as a result of KBR's misrepresentations, TES was damaged by agreeing to accept $12,424,387.71 less than the amount TES had invoiced to KBR for DFAC services. KBR and TES had agreed on the amount properly billable under its contractual arrangement and KBR had acknowledged in Amendment No. 2 and its own submissions to the government that TES' invoices were fair and reasonable, properly calculated, and properly supported.

54.     The Court further finds that had TES not entered into Amendment No. 2 but rather pursued its claims against KBR, TES would have sued, and recovered from, KBR the entire amount KBR acknowledged was properly incurred and invoiced under TES' outstanding DFAC invoices. By relying on KBR's false representations and entering into Amendment No. 2, TES accepted a total reduction of its properly billed invoices by $12,424,387.71.

## II.     CONCLUSIONS OF LAW

55.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a). There is diversity of citizenship between the parties and the matter in controversy, exclusive of interest and costs, exceeds $75,000. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

### Count I (Breach of Contract)

56.     In Count I, TES claims that KBR breached the Master Agreement when it refused to extend its period of performance beyond the original 180 day period identified in the Work Release for each of the H sites and then tortiously interfered with TES' contractual

relationships with its own subcontractors when KBR awarded a contract for those periods and those sites to TES' subcontractors.[30]

57.     Pursuant to Section 9.2 of the General Conditions, Texas law applies to this dispute.

58.     In order to prove under Texas law that KBR breached the Master Agreement, TES must prove by a preponderance of the evidence that: (1) a valid and enforceable contract existed between TES and KBR; (2) that TES performed or tendered performance required under that contract; (3) that KBR materially breached that contract; and (4) as a result of that material breach, TES has been damaged. *McGraw v. Brown Realty Co.*, 195 S.W. 3d 271, 276 (Tex. App. – Dallas 2006).[31]

59.     The parties' respective positions turn on the interpretation and application of Section 5 of the Master Agreement. Section 5.1 states that TES' performance of "SUBLET WORK" shall begin on the date set forth in the Work Release and shall continue until "the end of the 180 day period determined per the WORK RELEASE."

---

[30] TES does not claim a breach or damages with respect to the BIAP site.

[31] In support of its breach of contract claim, TES claims that under Section 5.4 of the Master Agreement, KBR was obligated to extend TES' period of performance by at least 540 days (three 180 day extensions) since the government required KBR's continued performance at TES' DFAC sites throughout that extended period and KBR never terminated the Master Agreement. In effect, TES views its Master Agreement as a requirements contract for DFAC/food services in Iraq for at least a two year period. KBR, on the other hand, contends that there was no need to terminate the Master Agreement since the Work Releases expired by their own terms and the Master Agreement itself did not obligate KBR to award additional work to TES. In this regard, KBR contends that TES fundamentally misreads Section 5.4. According to KBR, Section 5.4 does no more than give KBR the option to extend TES' period of performance if it determines, in its sole discretion, and without any obligation on its part to do so, that TES' services are "required." According to KBR, TES' reading of Section 5.4 is unreasonable and, in effect, would deprive KBR of its ability to discharge its own obligations under its cost plus contract with the United States.

SUBLET WORK is defined as the work required of TES under the "subcontract documents," which consists of the Master Agreement, General and Special Conditions, and the Work Releases. *See* DX 3 at §§ 1.1.1, 1.1.5, and 24.1.

60.     Section 5.4 of the Master Agreement provides:

> 5.4. An OPTION PERIOD **will be granted** to SUBCONTRACTOR extending the Period of Performance of the PROJECT, **if required**, in 180 day periods. PRICING for OPTION PERIOD(S) is further defined and discussed in the PRICING section of this document.

DX 3 (emphasis added).

61.     When interpreting a contract, a court must give effect to the parties' intentions as expressed in the contract. *Garcia v. R.C. Cola-7-Up Bottling Co.*, 667 S.W. 2d 517, 520 (Tex. 1984). The court must first decide whether the parties' intentions can be determined on the face of the contract or whether the contract is ambiguous. *Dynegy Midstream Services, Ltd. Partnership v. Apache Corp.*, 294 S.W. 3d 164, 168 (Tex. 2009); *Heritage Resources, Inc. v. NationsBank*, 939 S.W. 2d 118, 121 (Tex. 1996).[32]   In determining the parties' intentions, the Court considers the entire writing and attempts to harmonize and give effect to all the provisions of the contract.   *Hackberry Creek Country Club. V. Hackberry Creek Home Owners Ass'n*, 205 S.W. 3d 46, 55 (Tex. App. – Dallas 2006). No single provision taken alone will be given controlling effect. *Id.* at 55-56. A contract is ambiguous if the contract is susceptible to more than one reasonable interpretation when considered in this manner. *Dynegy Midstream Services, Ltd. Partnership*, 294 S.W. 3d at 168; *Heritage Resources, Inc.*, 939 S.W. 2d at 121. Whether a contract is ambiguous is a question of law. *Id.* Generally, extrinsic evidence is only

---

[32] Both parties contend that Section 5, and Section 5.4 in particular, is unambiguous and that this Court can interpret this provision as a matter of law.

admissible to interpret a contract after the court decides that the contract is ambiguous. *Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex. 1979).

62. The Court concludes that Section 5.4 of the Master Agreement is ambiguous with respect to the "option periods" at the H sites.[33] The Court may therefore consider the parole evidence admitted at trial in determining the parties' contractual intent with respect to the "option periods."[34] Particularly significant in this regard is the testimony of the two persons who negotiated the Master Agreement, Dan Petsche on behalf of KBR and Phil Morrell on behalf of TES.

63. Based on all the evidence, the reasonable inferences therefrom, and the Court's assessment of the credibility of the witnesses, the Court finds that the parties mutually understood and intended, as expressed by those who negotiated the Master Agreement,

---

[33] The meaning of Section 5.4 is bound up with the meaning of both defined terms and undefined terms, which themselves contain both defined and undefined terms. In short, this provision is a linguistic puzzle. OPTION PERIOD is defined as "an extension of the PROJECT beyond the initial Period of Performance." (Section 1.1.18) PROJECT is defined as "the Establishment and Operations of Dining Facilities (DFAC) Services in Kuwait and various locations in Iraq." (Section 1.1.6) SUBCONTRACTOR is defined as TES. (Section 1.1.11) "Period of Performance" is not a defined term, but clearly refers to the time period specified for performance, or duration, of the "SUBLET WORK" as set forth in the "WORK RELEASE" that authorizes the "SUBLET WORK." (Section 5.1) "SUBLET WORK" is defined as "all work and other requirements, expressed or implied, necessary for the performance required of the SUBCONTRACTOR by the Subcontract Documents." "Subcontract Documents" is not a defined term but clearly refers to the documents that make up the Subcontract, which are the Work Release and the Master Agreement. (Section 24.1) After substituting these definitions into Section 5.4, Section 5.4 translates into the pronouncement that an extension of DFAC services beyond the period specified in the Work Release, thereby extending the period of performance under the Work Release, will be granted to TES, if required, in 180 day periods. That decoding, however, casts no greater light on the meaning of "if required."

[34] In response to the parties' cross motions for summary judgment, the Court ruled that it would reserve on whether the contract was ambiguous and would conditionally admit at trial parole evidence pending its final decision as to whether the or not the Master Agreement was ambiguous.

that so long as KBR was required under its contract with the United States to provide DFAC services at the sites initially awarded to TES, KBR would extend the period of performance under the Work Releases issued to TES up to three additional six month periods; and that the Master Agreement could be terminated before the full 720-day performance period expired only by a termination for default or for convenience or if KBR was no longer required to perform. The Master Agreement did not provide KBR the unfettered discretion to determine whether or not to "exercise" an option to extend TES' period of performance. The evidence also demonstrates within the matrix of contracting documents pertaining to DFAC services that when a contracting party intended to reserve to itself the discretion KBR now claims under Section 5.4, language was used that made that intention clear. *See* PX 261 (Logcap III contract) at I-219 ("OPTION TO EXTEND THE TERM OF THE CONTRACT: (a) **The Government may extend** the term of this contract") and PX 83 (KBR Statement of Work) at § 3.2 (pertaining to follow-on DFAC subcontracts, stating that period of performance "may be extended **at the discretion of [KBR]**") (emphasis added).

64.    Based on the above, the Court concludes that KBR breached its obligation under Section 5.4 of the Master Agreement when, without first terminating the Master Agreement, it refused to extend the period of performance under the Work Releases issued to TES and instead entered into such contracts with other vendors. KBR's contractual obligation to provide DFAC services continued and KBR never terminated for default or convenience the Master Agreement before refusing to extend TES' period of performance and re-bidding the DFAC services at TES' previously awarded H sites.

65.    The Court also concludes that TES timely notified KBR of its claims to the extent

that any notice was required. KBR has had actual notice of TES' claims at all material times, received timely written notice of TES' claims, and cannot demonstrate any prejudice as a result of any alleged lack of notice.

66.     Having found that KBR breached a contractual obligation, the Court must next consider whether the contract is enforceable with respect to that breached duty to extend TES' period of performance. This issue revolves around whether the parties reached agreement on those essential terms that would allow a calculation of TES' damages with reasonable certainty.

67.     Neither the Master Agreement nor the Work Release for a particular site sets forth the pricing that would apply during the option periods. The closest the parties came to addressing that issue was in Paragraph 3.2 of the Master Agreement, which states:

> 3.2. PRICING shall be based in accordance with the pre-
> negotiated PER PERSON/PER DAY rate as follows:
> [listing PPPD if SUBCONTRACTOR does or does not
> supply food, but providing no formula or amount]

DX 3 (Master Agreement). Based on this provision, TES contends that the pricing from the initial period would simply be carried over to the option periods. KBR, on the other hand, contends that the parties always understood that pricing for any option period, were it awarded by KBR, would need to be negotiated and agreed upon, but the parties never agreed on such pricing.

68.     The Court finds that the Master Agreement is also ambiguous as to the parties' intentions concerning what pricing would be used during any option periods. The Court further finds that the parties understood and intended that any pricing for any option periods would need to be negotiated and agreed upon by them. In this regard, TES' senior executives testified that they understood that the pricing for DFAC services during

any option periods would need to be agreed to in negotiations and that TES expected that the pricing would be significantly lower since TES had, at KBR's direction, "front loaded" all start up facility and demobilization costs. It is also undisputed that the parties never agreed on pricing for any follow-on periods.

69. Because the parties failed to agree upon pricing for the option periods, the Court concludes that damages for KBR's breach cannot be calculated with reasonable certainty but would necessarily need to be calculated based on speculation and conjecture. This is particularly the case in light of KBR's ability to terminate the Master Agreement and the Work Releases for convenience at any time under Section 7.3.1 of the General Conditions that governed the contract. While TES may not have had any obligation to lower its prices for the option periods, the parties understood that they needed to reach an agreement on pricing for the option periods; yet the parties never reached an agreement on what the pricing would be.

70. The Court also concludes that the Master Agreement does not set forth a mechanism by which such option period prices could be calculated with reasonable certainty or such a pricing dispute would be resolved. In this regard, the parties' Disputes Clause applicable to the Master Agreement, by its terms, does not apply to disputes over prices never agreed to by the parties and, even if it did, the outcome of that disputes process is too speculative to allow for the calculation of damages, particularly when one considers KBR's ability to terminate the Master Agreement for convenience at any point. For these reasons, the Court concludes that the consequences of any breach are speculative. The Master Agreement as it pertains to the option periods fails for indefiniteness and is therefore not enforceable as to TES' claim with respect to the option

36

periods. *See, e.g., Ski River Development, Inc. v. McCalla*, 167 S.W. 3d 121, 134 (Tex. App. – Waco 2005) ("An agreement leaving material terms to be agreed upon later is not definite and specific as to material and essential terms and is, therefore, unenforceable."); *Colligan v. Smith*, 366 S.W. 2d 816, 280 (Tex. App. – Ft. Worth 1963) (noting that option contract that is indefinite would be unenforceable).

71.    For the above reasons, the Court concludes that judgment must be entered in favor of KBR on TES' breach of contract claim asserted in Count I.

## Count I (Tortious Interference with Contract)

72.    In Count I, TES also claims that KBR tortiously interfered with the contracts it had in place with its own subcontractors when, rather than extending TES' period of performance, KBR entered into contracts directly with TES' subcontractors for those follow-on periods of performance, particularly since TES had obtained non-compete agreements with its subcontractors.

73.    Under Texas law, in order to establish its claim of tortious interference with contract, TES must prove: (1) the existence of a contract subject to interference; (2) KBR's willful and intentional interference; (3) that the interference was the proximate cause of damages; and (4) actual damage or loss. *See Powell Indus., Inc. v. Allen*, 985 S.W. 2d 455, 456 (Tex. 1998).

74.    Having concluded that the Master Agreement did not give TES an enforceable contractual commitment for periods beyond the initial 180 performance period, the Court concludes that KBR did not tortiously interfere with TES' contractual relationships with its subcontractors.

75.     TES contends that it had written non-competition agreements with ABC and

Akfen and an oral non-competition agreement with Alargan and GCC and that KBR

knew of these alleged non-competition agreements between TES and its subcontractors

yet still solicited the subcontractors for follow-on work at the H sites.  The Court finds

insufficient evidence to establish the existence of any such restrictive covenants with

Akfen or an oral non-competition agreement with Alargan or GCC.  With respect to TES'

signed written non-competition agreement with ABC, the Court finds that TES waived

this agreement at the request of ABC so as to allow it to submit a bid directly to KBR for

work at the H-2 site and that TES generally told its subcontractors that they were free to

submit bids to KBR on any project in Iraq regardless of whether TES was interested in

the work.  For these reasons, the Court also finds that if any non-competition agreements

existed between TES and its subcontractors, TES waived them.

76.     For the above reasons, the Court concludes that judgment must be entered in favor

of KBR on TES' tortious interference claim asserted in Count I.

### Count II (Fraudulent Misrepresentation)

77.     In Count II, TES claims that KBR fraudulently induced it to enter into

Amendment No. 2, which released KBR from the balance of its claims for DFAC

services under its then outstanding invoices for DFAC services; and that it was damaged

as a result.

78.     In order to prove under Texas law that KBR committed fraud, TES must prove by

a preponderance of the evidence that: (1) KBR made representations that were false; (2)

KBR knew its misrepresentations were false, or that it made those misrepresentations

recklessly as a positive assertion without any  knowledge of their truth; (3) KBR intended

to induce TES to act on those misrepresentations; (4) TES actually and justifiably relied on the representations; and (5) TES suffered injury as a result of its justifiable reliance on such false representations. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001); *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W. 2d 507, 524 (Tex. 1998). Within the context of this case, TES must prove that KBR made a material misrepresentation, known by it to be false, or recklessly made without knowledge of its truth, with the intention to induce TES into entering Amendment No. 2, that TES relied on such a material misrepresentation and entered into Amendment No. 2 because of that misrepresentation, and that as a result TES accepted approximately $12 million less than it would have otherwise recovered from KBR.

79.      Based on the findings of fact set forth herein, the Court concludes that TES has proved by a preponderance of the evidence that KBR fraudulently induced TES to enter into Amendment No. 2 to the Master Agreement and that it was damaged as a result. *See Lundy v. Masson*, 260 S.W. 482, 493 (Tex. App. – Hous. 2008) (finding representation material where "a reasonable person would attach importance to and be induced to act on in determining his choice of actions in the transaction in question") (quoting *Burleson State Bank v. Plunkett*, 27 S.W. 3d 605, 613 (Tex. App. – Waco 2000)).

80.      With respect to the amount of recoverable damages, TES must prove that KBR's acts or omissions were a cause-in-fact of foreseeable losses. *Prospect High Income Fund v. Grant Thornton, LLP*, 203 S.W. 3d 602, 618 (Tex. App. – Dallas 2006). A defendant's acts or omissions are a cause-in-fact, in a fraud or negligent misrepresentation action, if the plaintiff can show that an act or omission was a substantial factor in bringing about an injury which would not otherwise have occurred. *Id.*

81.    The Court finds and concludes that but for KBR's misrepresentations, and given

KBR's acknowledgements in connection with Amendment Nos. 1 and 2 and its own

submissions to the government, TES would not have released KBR but rather would have

claimed against and recovered from KBR any unpaid portion of TES' outstanding DFAC

invoices.

82.    Paragraph 3.1.4 of the General Conditions of the Master Agreement provides that

"[n]otwithstanding any other provision hereof, payment by [the government] to [KBR] is

a condition precedent to any obligation of [KBR] to make payment hereunder, [KBR]

shall have no obligation to make payment to [TES] for any portion of the Sublet Work for

which [KBR] has not received payment from [the government]." DX 4 (General

Conditions) § 3.1.4. Paragraph 2.3 of Amendment No. 1 provides in pertinent part:

> TES acknowledges that KBR has represented that during
> the Term, KBR may be unable to pay TES certain amounts
> that are owed to TES for food services operations pursuant
> to the Master Agreement because KBR may not receive the
> funds necessary to pay TES from the U.S. government.
> TES acknowledges that under the terms of the Master
> Agreement, KBR's payments to TES are conditioned on
> KBR's receipt of payment from the Owner (United States
> Government).

PX 182. The Court finds and concludes that TES' recovery against KBR for the unpaid

portion of its DFAC invoices following the KBR-ASC settlement would not have been

prevented by the "pay when paid" provision" of the Master Agreement since KBR

released the government without TES' consent from any further payments for TES'

DFAC services.

83.    Under most circumstances,  pay-when-paid provisions are not "suspensive

conditions" but rather terms for payment that only delay a contractor's obligations to

make payment, and then only for a limited time. *See, e.g., In re Davidson Lumber Sales, Inc.*, 66 F.3d 1560, 1565 n.4 (10th Cir. 1995) ("Moreover, with respect to construction contracts, the general rule is that such pay-when-paid provisions do not operate as conditions precedent under which the duty to pay is contingent upon receipt of funds from a third party. . . [citation omitted]. To the contrary, these provisions are viewed as only postponing payment for a reasonable time and merely establishing a convenient time for payment."); *see also Pacific Lining Co. v. Algernon-Blair Constr. Co.*, 819 F.2d 602, 603 (5th Cir. 1987); *Gulf Constr. Co. v. Self*, 676 S.W. 2d 624, 629 (Tex. App.-Corpus Christi 1984) ("The Court finds as a matter of law that the risk of non-payment by an owner on a construction contract rests on the contractor who contracts with such owner rather than on a subcontractor who has no privity of contract with the owner," although a clear and unequivocal clause may be enforceable.).

84.     The KBR-ASC settlement did not limit TES' recovery against KBR on its DFAC invoices given the manner in which KBR chose to enter into that settlement. Section 3.0 of the Special Conditions provides, among other things, that a decision by the government is binding upon TES only if (1) KBR promptly notifies TES of the decision; and (2) if requested, KBR pursues an appeal under the disputes clause of its contract with the government. DX 220 at § 3.1. Here, the KBR-ASC settlement eliminated the need for a government decision for the purposes of this provision and, in any event, KBR did not notify TES of the KBR-ASC settlement before it entered into it. In addition, KBR waived further claims against the government regarding the DFAC invoices and therefore could not have, in any event, pursued an appeal on TES' behalf for additional compensation if TES had requested it to do so. For these reasons, the "prevention

doctrine" precludes KBR from relying upon the pay-when-paid provisions. As the

Fourth Circuit observed in *Moore Brothers Co. v. Brown & Root, Inc.*, 207 F.3d 717 (4th

Cir. 2000):

> The prevention doctrine is a generally recognized principle
> of contract law according to which if a promisor prevents
> or hinders fulfillment of a condition to his performance, the
> condition may be waived or excused.

*See also, Merrill Lynch, Pierce, Fenner & Smith, P.C. v. Greystone Servicing Corp.*, No.

3:06-cv-575, 2009 WL 2568323, *12 (N.D. Tex. Aug. 18, 2009) ("At [its] heart the

prevention doctrine, as it has been called, is merely a corollary to the general principle

that equity will not permit one to rely on one's own misconduct") (quoting *In re*

*Stevenson Assoc. Inc.*, 777 F.2d 415, 419 (8th Cir. 1985)); Restatement (Second) of

Contracts § 245.

85.     Here, KBR, without TES' knowledge or consent, made a conscious, deliberate,

and voluntary decision to settle for an amount less than the amount of outstanding DFAC

invoices and to release the government from further claims based on those invoices,

thereby foreclosing KBR from obtaining further payment from the government on behalf

of its subcontractors. By releasing and waiving any additional claims against the

government for DFAC services, KBR eliminated KBR's and TES' ability to seek

additional compensation from the United States. TES would have been bound by KBR's

release and waiver only if KBR had provided notice to TES of the proposed settlement

between KBR and the United States and TES had consented to it. The "pay when paid"

provision of the Master Agreement was inextricably bound up with TES' rights against

the government in the event of a dispute. KBR's actions eliminated TES' rights to seek

additional payments on its outstanding DFAC invoices and now prevent KBR from relying on the "pay when paid" provision of the Master Agreement.

86. The Court further finds and concludes that TES is entitled to recover prejudgment interest on the Court's award. *See Wood v. Armco, Inc.*, 814 F.2d 211 (5th Cir. 1987) (upholding award of prejudgment interest on recovery for fraud claim under Texas law). The prejudgment interest rate is 5% annum based on Texas statutory and case law. *See* Tex. Fin. Code § 304.003(c); *Tennessee Gas Pipeline Co. v. Technip USA Corp.*, No. 01-06-535, 2008 WL 3876141, *24 (Tex. App. – Houston Aug. 21, 2008) (determining prejudgment interest rate in breach of contract claim, the court explained, "[w]hen the interest rate is not specified in a contract, pre-judgment interest should be calculated based on the statutory rate provided in Texas Finance Code section 304.003"); *Johnson & Higgins of Texas, Inc*, 962 S.W. 2d at 532-33 (establishing rule that statutory rate of interest governs prejudgment interest awarded pursuant to Texas common law for all judgments rendered on or after December 11, 2007). Under Texas common law, prejudgment interest begins to accrue on the earlier of (1) 180 days after the date the defendant receives a written notice of a claim or (2) the date suit is filed. *CWTM Corp. v. AM General L.L.C.*, No. 04-cv-2857, 2006 WL 1804622, *11 (S.D. Tex. June 28, 2006); *Johnson & Higgins of Texas, Inc.*, 962 S.W. 2d at 531. The Court finds that, here, had there been no fraud, TES would have known that its claim against KBR for the outstanding DFAC invoice payments existed and would have notified KBR at the same time TES provided written notice of its other claims on June 24, 2005. *See American Network Leasing Corp. v. Corp. Funding-Houston, Inc.*, No. 01-cv-789, 2002 WL 31266230 (Tex. App. – Houston Oct. 10, 2002) (upholding award of prejudgment interest

assessed from date plaintiff suffered actual damages as a result of breach of partnership agreement nine years before judgment was entered). Accordingly, the Court assesses prejudgment interest from December 21, 2005. Based on the above findings and conclusions, the Court concludes that TES suffered compensatory damages in the amount of $12,424,387, together with prejudgment interest at the rate 5% from December 21, 2005 to the date before judgment entered in this case, or $2,551,254, for a total compensatory award of $14,975,641.

87.    Under Texas law, a plaintiff may recover punitive or exemplary damages if the plaintiff proves by clear and convincing evidence "[t]hat the harm with respect to which the claimant seeks recovery of exemplary damages results from: (1) fraud; (2) malice; or (3) gross negligence." Tex. Civ. Prac. & Rem. Code § 41.003. *Whitney Nat'l Bank v. Air Ambulance*, No. H-04-2220, 2007 WL 1643218 (S.D. Tex. June 4, 2007) (awarding $1 million in exemplary damages under Texas law for fraudulent misrepresentations); *Bright v. Addison*, 171 S.W. 3d 588 (Tex. App. – Dallas 2005) (upholding exemplary damages award of $5 million dollars in breach of fiduciary duty case). In assessing whether to impose punitive damages and the amount of any such award, the Court should consider the nature of the wrong, the character of the conduct, the degree of culpability, and the extent to which such conduct offends a public sense of justice and propriety. Tex. Civ. Prac. & Rem. Code § 41.011 (listing factors to consider in determining the amount of exemplary damages).

88.    The Court finds and concludes that TES has proved by clear and convincing evidence its claim of fraudulent misrepresentation in Count 2. The Court has also considered all the evidence at trial pertaining to the fraudulent misrepresentations and the

factors described above, including, among others, the nature of the fraudulent misrepresentations, the circumstances under which the misrepresentations were made, KBR's motives and objectives, KBR's degree of culpability, KBR's financial wherewithal, as evidenced by the contracts and financial dealings in evidence, and, importantly, the character of the conduct generally and the extent to which such conduct offends a public sense of justice and propriety, particularly in light of the critical and trusted role that KBR was given to play by the United States, essentially as its representative, and the necessity for KBR's subcontractors to rely on KBR's good faith, honesty, and integrity in administering war contracts in a war zone.

89.     In this case, KBR's conduct was part of a well orchestrated and thought-out plan, reviewed by its management before being implemented, in order to eliminate KBR's legal exposure for tens of millions of dollars in additional liability to its subcontractors, and TES in particular, its largest DFAC creditor. For that purpose, KBR mischaracterized, misrepresented, and concealed the true nature of its settlement with the United States, how KBR and the government arrived at their settlement agreement, how the site specific allocations were calculated for the purposes of that settlement, for what purpose those site by site allocations were made, the mandated government actions relative to KBR's subcontractors as a result of that settlement with the government, the benefits KBR received under its government settlement at the expense of TES, and what TES' remedies were in the event it did not accept the amount that KBR offered. In pursuing this strategy, KBR's objective was to induce TES to release KBR as to the balance of the monies it had acknowledged were payable to TES, for which KBR, not the government, was solely responsible following the KBR-ASC settlement.

Organizationally, KBR devised a scheme that was intended to conceal accurate information from TES, even to the point of concealing accurate information from certain of its own employees who were selected because of their professional stature to convey false information to TES. KBR's conduct cannot be excused or justified by its belief that it was acting in the best interests of its subcontractors or that, had it not reached an agreement, the government would have made a unilateral decision concerning the amount the government would pay on outstanding DFAC invoices and that, without a settlement, it was likely that the government was going to withhold more than the $55 million decrement KBR had negotiated. Had KBR thought it was acting in the best interests of TES and that TES should be bound to the settlement it reached on its behalf, there were clear and settled procedures to be followed to achieve that result, which KBR intentionally chose not to follow. Having made the decision to resolve its contractual dispute with the government without the knowledge or participation of TES, KBR was then not free to misrepresent what had happened in order to eliminate its own remaining legal exposure to TES. Based on all the evidence and all of the relevant considerations, the Court finds that an award of punitive damages in the amount of $4 million is appropriate.

## III. CONCLUSION

For the above reasons, the Court will enter judgment in favor of Defendants and against Plaintiff The Event Source as to Count 1 (breach of contract and tortious interference with contract) and in favor of Plaintiff The Event Source and against Defendants as to Count 2 (fraudulent misrepresentation).

An appropriate Order will issue.

Anthony J. Trenga
United States District Judge

Alexandria, Virginia
January 29, 2010